MARKMAN, J.
We granted leave to appeal to consider whether the marriage amendment, Const 1963, art 1, § 25, which states that “the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose,” prohibits public employers from providing health-insurance benefits to their employees’ qualified same-sex domestic partners. Because we agree with the Court of Appeals that providing such benefits does violate the marriage amendment, we affirm its judgment.
I. FACTS AND HISTORY
The marriage amendment, Const 1963, art 1, § 25, was approved by a majority of the voters on November 2, 2004, and took effect as a provision of the Michigan Constitution on December 18, 2004. At that time, several public employers, including state universities and various city and county governments, had policies or agreements in effect that extended health-insurance benefits to their employees’ qualified same-sex domestic partners. In addition, the Office of the State Employer (OSE) and the United Auto Workers Local 6000 (UAW) had reached a tentative agreement to include same-sex domestic-partner health-insurance benefits in the benefit package for state employee members of the union. However, on December 2, 2004, the OSE and the *61 UAW agreed not to submit the proposed contract to the Civil Service Commission until after there had been a court determination that the language of the proposed contract did not violate the marriage amendment.
On March 16, 2005, in response to a state representative’s request for an opinion regarding the marriage amendment’s effect on the city of Kalamazoo’s ability to provide same-sex domestic-partner health-insurance benefits to its employees, the Attorney General issued a formal opinion, concluding that the city’s policy did violate the amendment. The Attorney General asserted that “Const 1963, art 1, § 25 prohibits state and local governmental entities from conferring benefits on their employees on the basis of a ‘domestic partnership’ agreement that is characterized by reference to the attributes of a marriage.” OAG, 2005-2006, No 7,171, p 17 (March 16, 2005).
On March 21, 2005, plaintiffs[1] filed this declaratory judgment action against the Governor, seeking a declaration that the marriage amendment does not bar public employers from providing health-insurance benefits to their employees’ qualified same-sex domestic partners. After the city of Kalamazoo announced its intention not to provide same-sex domestic-partner health-insurance benefits to its employees for contracts *62 beginning in January 2006 absent a court ruling that such benefits do not violate the marriage amendment, plaintiffs added the city of Kalamazoo as a defendant. The Attorney General, acting on behalf of the Governor, moved to dismiss plaintiffs’ suit. The Governor obtained separate counsel, who withdrew the motion to dismiss and filed a brief supporting plaintiffs. The Attorney General then intervened in his own right and adopted the brief that he had initially filed on the Governor’s behalf as his own.
The trial court granted plaintiffs’ motion for summary disposition and declared that the marriage amendment does not bar public employers from providing health-insurance benefits to their employees’ qualified same-sex domestic partners. The court held that health-insurance benefits do not constitute one of the “benefits of marriage.” Unpublished opinion of the Ingham Circuit Court, issued September 27, 2005 (Docket No. 05-368-CZ), p 7. The court further held that the “criteria [used by the public employers] also do not recognize a union ‘similar to marriage’ ” because the “criteria, even when taken together, pale in comparison to the myriad of legal rights and responsibilities accorded to those with marital status.” Id. at 9.
The Attorney General appealed and moved for a stay. The Court of Appeals granted the motion for a stay and reversed the trial court, declaring that the marriage amendment does bar public employers from providing health-insurance benefits to their employees’ qualified same-sex domestic partners. Nat'l Pride at Work, Inc v Governor, 274 Mich App 147; 732 NW2d 139 (2007). The Court of Appeals held that “a publicly recognized domestic partnership need not mirror a marriage in every respect in order to run afoul of article 1, § 25 because the amendment plainly precludes recognition *63 of a ‘similar union for any purpose.’ ” Id. at 163. “All the plans listed establish criteria for eligibility that are similar to those for marriage.” Id. at 164. “[T]he agreement between the employee and the dependent constitutes a union similar to marriage, because with the agreement (as with a marriage), the employer has a legal obligation to recognize the union and provide benefits to the eligible dependent (as with a spouse).” Id. Finally,
[t]he requirement that an employee prove the existence either of a written domestic-partnership agreement or an agreement between the employee and the dependent to be jointly responsible for basic living and household expenses, in order to establish eligibility by the partner or dependent for insurance coverage, constitutes recognition by the public employer of a ‘similar union for any purpose,’ i.e., the purpose of extending to domestic partners and dependents the benefit of insurance coverage equivalent to coverage that is extended to spouses. [Id. at 165.]
Plaintiffs and the Governor appealed, and this Court granted the applications for leave to appeal. 478 Mich 862 (2007).
II. STANDARD OF REVIEW
A trial court’s decision to grant a motion for summary disposition is reviewed de novo. Goldstone v Bloomfield Twp Pub Library, 479 Mich 554, 558; 737 NW2d 476 (2007). Questions of constitutional interpretation are also reviewed de novo. Id.
III. ANALYSIS
A. DOMESTIC-PARTNERSHIP POLICIES
The tentative agreement reached by the OSE and the UAW would require domestic partners to meet the following criteria in order to receive health-insurance benefits:
*64 1. Be at least 18 years of age.
2. Share a close personal relationship with the employee and be responsible for each other’s common welfare.
3. Not have a similar relationship with any other person, and not have had a similar relationship with any other person for the prior six months.
4. Not be a member of the employee’s immediate family as defined as employee’s spouse, children, parents, grandparents or foster parents, grandchildren, parents-in-law, brothers, sisters, aunts, uncles or cousins.
5. Be of the same gender.
6. Have jointly shared the same regular and permanent residence for at least six months, and have an intent to continue doing so indefinitely.
7. Be jointly responsible for basic living expenses, including the cost of food, shelter and other common expenses of maintaining a household. This joint responsibility need not mean that the persons contribute equally or in any particular ratio, but rather that the persons agree that they are jointly responsible.
The tentative agreement also provides: “In order to establish whether the criteria have been met, the employer may require the employee to sign an Affidavit setting forth the facts and circumstances which constitute compliance with those requirements.”
The city of Kalamazoo’s “Domestic Partner Benefits Policy,” incorporated in its collective-bargaining agreements, provided health-insurance benefits to the domestic partners of the city’s employees who met the following criteria:
For the purposes of the City of Kalamazoo’s program, the definition and use of the term domestic partner shall only include couples of the same sex. To be considered as domestic partners, the individuals must:
*65 A. Be at least 18 and mentally competent to enter into a contract;
B. Share a common residence and have done so for at least six (6) months;
C. Be unmarried and not related by blood closer than would prevent marriage;
D. Share financial arrangements and daily living expenses related to their common welfare;
E. File a statement of termination of previous domestic partnership at least six (6) months prior to signing another Certification of Domestic Partnership. [Emphasis in the original.]
The city also required the employee arid his or her domestic partner to sign a notarized certification of domestic partnership that affirmed these criteria. In addition, they were required to provide evidence of “mutual economic dependence,” such as a joint lease or mortgage, and evidence of a “common legal residence,” such as driver’s licenses or voter’s registrations. Finally, the city’s policy provided: “It is the intent of this program to provide insurance coverage and other benefits to domestic partners of the City of Kalamazoo identical to those provided to spouses of City employees.”
For a domestic partner to be eligible for health-insurance benefits under the University of Michigan’s “Same-Sex Domestic Partner Policy,” the employee and his or her partner must:
* Be of the same sex; and
* Not be legally married to another individual; and
* Have registered or declared the Domestic Partnership in the manner authorized by a municipality or other government entity;[2] and
*66 * Have allowed at least six months to pass since the dissolution of a previous same-sex domestic partnership in the manner authorized by a municipality or other government entity.
Michigan State University provided health-insurance benefits to its employees’ domestic partners if the employee and the domestic partner:
1. are [the] same-sex and for this reason are unable to marry each other under Michigan law,
2. are in a long-term committed relationship, have been in the relationship for at least 6 months, and intend to remain together indefinitely,
3. are not legally married to others and neither has another domestic partner,
4. are at least 18 years of age and have the capacity to enter into a contract,
5. are not related to one another closely enough to bar marriage in Michigan,
6. share a residence and have done so for more than 6 months,
7. are jointly responsible to each other for the necessities of life, and
8. provide a signed “partnership agreement” that obligates each of the parties to provide support for one another, and provides for substantially equal division, *67 upon termination of the relationship, of earnings during the relationship and any property acquired with those earnings.[3]
B. MARRIAGE AMENDMENT
The marriage amendment, Const 1963, art 1, § 25, provides: “To secure and preserve the benefits of marriage for our society and for future generations of children, the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose.”
The primary objective in interpreting a constitutional provision is to determine the original meaning of the provision to the ratifiers, “we the people,” at the time of ratification. Justice COOLEY has described this rule of “common understanding” in this way:
For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed. [Cooley, Constitutional Limitations (1st ed), p 66.]
Thus, the primary objective of constitutional interpretation, not dissimilar to any other exercise in judicial interpretation, is to faithfully give meaning to the intent of those who enacted the law. This Court typically discerns the common understanding of constitutional text by applying each term’s plain meaning at the *68 time of ratification. Wayne Co v Hathcock, 471 Mich 445, 468-469; 684 NW2d 765 (2004).
C. “SIMILAR UNION”
Plaintiffs argue that “the only thing that is prohibited by the [marriage] amendment is the recognition of a same-sex relationship as a marriage” and that the public employers here are not recognizing a domestic partnership “as a marriage.” Plaintiffs brief on appeal (Docket No. 133554), p 23 (emphasis in the original). We respectfully disagree. First, the amendment prohibits the recognition of a domestic partnership “as a marriage or similar union . . ..” That is, it prohibits the recognition of a domestic partnership as a marriage or as a union that is similar to a marriage. Second, just because a public employer does not refer to, or otherwise characterize, a domestic partnership as a marriage or a union similar to a marriage does not mean that the employer is not recognizing a domestic partnership as a marriage or a union similar to a marriage. Cf. id. at 26 (“In providing benefits to the same-sex partners of their employees, these employers have not declared the same-sex partnership to be a marriage or anything similar to marriage.”) (emphasis added).[4]
The pertinent question is not whether public employers are recognizing a domestic partnership as a mar *69 riage or whether they have declared a domestic partnership to be a marriage or something similar to marriage; rather, it is whether the public employers are recognizing a domestic partnership as a union similar to a marriage. A “union” is “something formed by uniting two or more things; combination;... a number of persons, states, etc., joined or associated together for some common purpose.” Random House Webster’s College Dictionary (1991). Certainly, when two people join together for a common purpose and legal consequences arise from that relationship, i.e., a public entity accords legal significance to this relationship, a union may be said to be formed. When two people enter a domestic partnership, they join or associate together for a common purpose, and, under the domestic-partnership policies at issue here, legal consequences arise from that relationship in the form of health-insurance benefits. Therefore, a domestic partnership is most certainly a union.
The next question is whether a domestic partnership is similar to a marriage. Plaintiffs and the dissent argue that because the public employers here do not bestow upon a domestic partnership all the legal rights and responsibilities associated with marriage,[5] the partnership is not similar to a marriage. Again, we respectfully disagree. “Similar” means “having a likeness or resemblance, [especially] in a general way; having qualities in common[.]” Random House Webster’s College Dictionary (1991); see also White v City of Ann Arbor, 406 Mich 554, 572-574; 281 NW2d 283 (1979). A union does *70 not have to possess all the same legal rights and responsibilities that result from a marriage in order to constitute a union “similar” to that of marriage. If the marriage amendment were construed to prohibit only the recognition of a union that possesses legal rights and responsibilities identical to those that result from a marriage, the language “or similar union” would be rendered meaningless, and an interpretation that renders language meaningless must be avoided. Sweatt v Dep’t of Corrections, 468 Mich 172, 183; 661 NW2d 201 (2003) (opinion by MAEKMAN, J.). Further, the dissimilarities identified by plaintiffs are not dissimilarities pertaining to the nature of the marital and domestic-partnership unions themselves, but are merely dissimilarities pertaining to the legal effects that are accorded these relationships. However, given that the marriage amendment prohibits the recognition of unions similar to marriage “for any purpose,” the pertinent question is not whether these unions give rise to all the same legal effects; rather, it is whether these unions are being recognized as unions similar to marriage “for any purpose.”[6]
For these reasons, we respectfully disagree with the trial court’s conclusion that the “criteria [used by the *71 public employers]... do not recognize a union ‘similar to marriage’ ” because the “criteria, even when taken together, pale in comparison to the myriad of legal rights and responsibilities accorded to those with marital status.” Unpublished opinion of the Ingham Circuit Court, issued September 27, 2005 (Docket No. 05-368-CZ), p 9. Instead, we agree with the Court of Appeals that “a publicly recognized domestic partnership need not mirror a marriage in every respect in order to run afoul of article 1, § 25 because the amendment plainly precludes recognition of a ‘similar union for any purpose.’ ” Nat’l Pride, 274 Mich App at 163.[7]
All the domestic-partnership policies at issue here require the partners to be of a certain sex, i.e., the same sex as the other partner.[8] Similarly, Michigan law requires married persons to be of a certain sex, i.e., a different sex from the other. MCL 551.1 (“Marriage is inherently a unique relationship between a man and a *72 woman.”).[9] In addition, each of the domestic-partnership policies at issue in this case requires that the partners not be closely related by blood.[10] Similarly, Michigan law requires that married persons not be closely related by blood. MCL 551.3[11] and MCL 551.4.[12] Although there are, of course, many different types of relationships in Michigan that are accorded legal significance — e.g., debtor-creditor, parent-child, landlord-tenant, attorney-client, employer-employee— marriages and domestic partnerships appear to be the only such relationships that are defined in terms of both *73 gender and the lack of a close blood connection.[13] As discussed earlier, “similar” means “having a likeness or resemblance, [especially] in a general way; having qualities in common!.]” Random House Webster’s College Dictionary (1991). Marriages and domestic partnerships share two obviously important, and apparently unique (at least in combination), qualities in common.[14] *74 Because marriages and domestic partnerships share *75 these “similar” qualities, we believe that it can fairly be said that they “resembl[e]” one another “in a general way.” Therefore, although marriages and domestic partnerships are by no means identical, they are similar. Because marriages and domestic partnerships are the only relationships in Michigan defined in terms of both gender and lack of a close blood connection, and, thus, have these core “qualities in common,” we conclude that domestic partnerships are unions similar to marriage.[15]
D. “RECOGNIZED”
The next question concerns whether public employers are truly recognizing a domestic partnership as a union similar to marriage when they provide health-insurance benefits to domestic partners on the basis of the partnership. “Recognize” is defined as “to perceive or acknowledge as existing, true, or valid[.]” Random House Webster’s College Dictionary (1991). When a public employer attaches legal consequence to a relationship, that employer is clearly “recognizing” that relationship. That is, by providing legal significance to a relationship, the public employer is acknowledging the validity of that relationship. When public employers provide domestic partners health-insurance benefits on *76 the basis of the domestic partnership, they are without a doubt recognizing the partnership.[16]
E. “ONLY AGREEMENT”
The next question concerns whether public employers are recognizing an “agreement” when they provide health-insurance benefits to domestic partners. An “agreement” is “the act of agreeing or of coming to a mutual arrangement.” Id. The city of Kalamazoo’s, the University of Michigan’s, and Michigan State University’s policies require putative partners to sign a domestic-partnership agreement. The OSE’s policy requires partners to “agree that they are jointly responsible” “for basic living expenses . . . .” Obviously, if two people have decided to sign a domestic-partnership agreement or have agreed to be jointly responsible for basic living expenses, they have come to a mutual arrangement.[17] Therefore, public employers recognize an agreement when they provide health-insurance benefits to domestic partners on the basis of a domestic partnership.
However, the marriage amendment specifically states that the “only” agreement that can be recognized as a marriage or similar union is the union of one man and *77 one woman. “Only” means “the single one... of the kind; lone; sole[.]” Random House Webster’s College Dictionary (1991). Therefore, a single agreement can be recognized within the state of Michigan as a marriage or similar union, and that single agreement is the union of one man and one woman. A domestic partnership does not constitute such a recognizable agreement.
F. “FOR ANY PURPOSE”
Furthermore, the marriage amendment specifically prohibits recognizing “for any purpose” a union that is similar to marriage but is not a marriage. “Any” means “every; all[.]” Id. Therefore, if there were any residual doubt regarding whether the marriage amendment prohibits the recognition of a domestic partnership for the purpose at issue here, this language makes it clear that such a recognition is indeed prohibited “for any purpose,” which obviously includes for the purpose of providing health-insurance benefits. Whether the language “for any purpose” is essential to reach the conclusion that health-insurance benefits cannot be provided under the instant circumstances, or merely punctuates what is otherwise made clear in the amendment, the people of this state could hardly have made their intentions clearer.
G. “BENEFITS OF MARRIAGE”
The marriage amendment begins with a statement of its purpose that is effectively a preamble: “To secure and preserve the benefits of marriage for our society and for future generations of children .. . .” Plaintiffs argue that the marriage amendment does not prohibit public employers from providing health-insurance benefits to their employees’ qualified same-sex domestic partners because health-insurance benefits do not con *78 stitute a benefit of marriage.[18] However, the marriage amendment contains more than just a statement of purpose. In full, it states: “To secure and preserve the benefits of marriage for our society and for future generations of children, the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose.” The latter — the operative — part of this provision sets forth how the ratifiers intended to go about achieving the purposes set forth in the first part, “securing] and preserving] the benefits of marriage ....” This operative part specifies that public employers must not recognize domestic partnerships for any purpose. That is, the first part of the amendment states its purpose, and the second part states the means by which this purpose is to be achieved. Doubtless, there are those who would disagree about the efficacy of achieving the former purpose by the latter means. However, it is not for this Court to decide whether there are superior means for “securing] and preserving] the benefits of marriage,” or indeed whether the means chosen in the *79 amendment are ineffectual or even counterproductive. The people of this state have already spoken on this issue by adopting this amendment.[19] They have decided to “secure and preserve the benefits of marriage” by ensuring that unions similar to marriage are not recognized in the same way as a marriage for any purpose.[20]
*80 H. EXTRINSIC EVIDENCE
Plaintiffs and the dissent argue that Citizens for the Protection of Marriage, an organization responsible for placing the marriage amendment on the 2004 ballot and a primary supporter of this initiative during the ensuing campaign, published a brochure that indicated that the proposal would not preclude public employers from offering health-insurance benefits to their employees’ domestic partners. However, such extrinsic evidence can hardly be used to contradict the unambiguous language of the constitution. American Axle & Mfg, Inc v Hamtramck, 461 Mich 352, 362; 604 NW2d 330 (2000) (“[R]eliance on extrinsic evidence was inappropriate because the constitutional language is clear.”). As Justice COOLEY explained:
The object of construction, as applied to a written constitution, is to give effect to the intent of the people in adopting it. In the case of all written laws, it is the intent of the lawgiver that is to be enforced. But this intent is to be found in the instrument itself.... “Where a law is plain and unambiguous, whether it be expressed in general or limited terms, the [lawgiver] should be intended to mean what they have plainly expressed, and consequently no room is left for construction.” [Cooley, Constitutional Limitations (1st ed), p 55 (emphasis in the original), quoted in American Axle, 461 Mich at 362.]
When the language of a constitutional provision is unambiguous, resort to extrinsic evidence is prohibited, and, as discussed earlier, the language of the marriage amendment is unambiguous.[21]
*81 In Michigan Civil Rights Initiative v Bd of State Canvassers, 475 Mich 903, 903 (2006) (MArkman, J., concurring), in which it was alleged that numerous petition signatures had been obtained in support of placing the Michigan Civil Rights Initiative (MCRI) on the ballot by circulators who misrepresented the MCRI, it was emphasized that “the signers of these petitions did not sign the oral representations made to them by circulators; rather, they signed written petitions that contained the actual language of the MCRI.” Similarly, the voters here did not vote for or against any brochure produced by Citizens for the Protection of Marriage; rather, they voted for or against a ballot proposal that contained the actual language of the marriage amendment.[22]
*82 Moreover, like the Citizens for the Protection of Marriage, the Michigan Civil Rights Commission issued a statement asserting:
If passed, Proposal 2 would result in fewer rights and benefits for unmarried couples, both same-sex and heterosexual, by banning civil unions and overturning existing domestic partnerships. Banning domestic partnerships would cause many Michigan families to lose benefits such as health and life insurance, pensions and hospital visitation rights.[23]
*83 Therefore, all that can reasonably he discerned from the extrinsic evidence is this: before the adoption of the marriage amendment, there was public debate regarding its effect, and this debate focused in part on whether the amendment would affect domestic-partnership benefits. The people of this state then proceeded to the polls, they presumably assessed the actual language of the amendment in light of this debate, and a majority proceeded to vote in favor.[24] The role of this Court is not to determine *84 who said what about the amendment before it was ratified, or to speculate about how these statements may have influenced voters. Instead, our responsibility is, as it has always been in matters of constitutional interpretation, to determine the meaning of the amendment’s actual language.[25]
When the dissent accuses the majority of “condoning] and even encouraging] the use of misleading tactics in ballot campaigns,” post at 102, we can only surmise from this that the dissent believes that this Court must defer in its constitutional interpretations, not to the language of the constitution, but to myriad statements from private individuals and organizations, some of which may have ascribed meanings to the constitution utterly at odds with its actual language. We do not believe the people of this state have acquiesced in this delegation of judicial responsibility from the courts to private interest groups.
I. OTHER STATES
Finally, none of the decisions from other states on which plaintiffs rely is helpful because none involves *85 the specific language contained in Michigan’s marriage amendment. See, e.g., State v Carswell, 114 Ohio St 3d 210; 871 NE2d 547 (2007) (constitutional provision, Ohio Const art 15, § 11, providing: “Only a union between one man and one woman may be a marriage valid in or recognized by this state and its political subdivisions.”); Knight v Superior Court of Sacramento Co, 128 Cal App 4th 14; 26 Cal Rptr 3d 687 (2005) (statute, Cal Fam Code 308.5, providing that “[o]nly marriage between a man and a woman is valid or recognized in California”); Devlin v Philadelphia, 580 Pa 564; 862 A2d 1234 (2004) (statute, 23 Pa Cons Stat 1704, providing that “marriage shall be between one man and one woman”); Tyma v Montgomery Co, 369 Md 497; 801 A2d 148 (2002) (statute, Md Code Ann Fam Law 2-201, providing that “[o]nly a marriage between a man and a woman is valid in this State”); Heinsma v City of Vancouver, 144 Wash 2d 556; 29 P3d 709 (2001) (statute, Wash Rev Code 26.04.010(1), providing that “[m]arriage is a civil contract between a male and a female”); Lowe v Broward Co, 766 So 2d 1199 (Fla App, 2000) (statute, Fla Stat 741.212[1], providing that “[m]arriages between persons of the same sex entered into in any jurisdiction ... are not recognized for any purpose in this state”); Crawford v Chicago, 304 Ill App 3d 818; 710 NE2d 91 (1999) (statute, 750 Ill Comp Stat 5/201, providing that a marriage is valid if it is “between a man and a woman”); Slattery v New York City, 266 AD2d 24; 697 NYS2d 603 (1999) (statute, NY Dorn Rel Law 12, providing that “the parties must solemnly declare in the presence of a clergyman or magistrate and the attending witness or witnesses that they take each other as husband and wife”); Schaefer v City of Denver, 973 P2d 717 (Colo App, 1998) (statute, Colo Rev Stat 14-2-104[l][b], providing that a marriage is valid if it is “only between one man and one woman”). As the *86 Washington Court of Appeals explained, “Michigan’s marriage amendment is unique from other jurisdictions because it prohibits the recognition of not only same-sex marriages, but also ‘similar unions.’ ” Leskovar v Nickels, 140 Wash App 770, 780; 166 P3d 1251 (2007). “Washington’s marriage statute prohibits marriage by ‘persons other than a male and a female.’ It is distinct from Michigan’s marriage amendment, and does not prohibit the recognition of ‘similar unions for any purpose.’ ” Id.
The same is true of all the cases cited by plaintiffs— each is interpreting a provision of law that is simply too different from Michigan’s marriage amendment to be of persuasive value in determining how this state’s amendment should be interpreted.
IV CONCLUSION
The trial court held that providing health-insurance benefits to domestic partners does not violate the marriage amendment because public employers are not recognizing domestic partnerships as unions similar to marriage, given the significant distinctions between the legal effects accorded to these two unions. However, given that the marriage amendment prohibits the recognition of unions similar to marriage “for any purpose,” the pertinent question is not whether these unions give rise to all of the same legal effects; rather, it is whether these unions are being recognized as unions similar to marriage “for any purpose.” Recognizing this and concluding that these unions are indeed being recognized as similar unions “for any purpose,” the Court of Appeals reversed. We affirm its judgment.[26] *87 That is, we conclude that the marriage amendment, Const 1963, art 1, § 25, which states that “the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose,” prohibits public employers from providing health-insurance benefits to their employees’ qualified same-sex domestic partners.
Taylor, C.J., and Weaver, Corrigan, and Young, JJ., concurred with MARKMAN, J.

 Plaintiff National Pride at Work, Inc., is a nonprofit organization of the American Federation of Labor-Council of Industrial Organizations. The remaining plaintiffs are employees of the city of Kalamazoo, the University of Michigan, Michigan State University, Eastern Michigan University, Wayne State University, the Clinton/Eaton/Ingham County Community Mental Health Board, or the state of Michigan and those employees’ same-sex partners. Because the benefit plans of Eastern Michigan University, Wayne State University, and the Eaton/Clinton/Ingham Community Mental Health Board are not part of the record, they are not discussed. Likewise, this opinion does not address whether private employers can provide health-insurance benefits to their employees’ same-sex domestic partners.

 The city of Ann Arbor’s “Declaration of Domestic Partnership” requires the partners to “declare the following to be true”:
*66 1. We are in a relationship of mutual support, caring and commitment.
2. We share the common necessities of life.
3. We are not related by blood in a manner that would bar marriage in the State of Michigan.
4. We are not married or in any other domestic partnership.
5. We are at least 18 years of age and otherwise competent to enter into a contract.

 When we use the term “domestic partnership” in this opinion, we refer to a partnership that satisfies the criteria contained in one of the domestic-partnership policies described in this opinion.

 Plaintiffs seem to argue that if a public employer had provided health-insurance benefits to spouses, and had defined “spouses” to include domestic partners, this would violate the amendment, but because the public employers here did not refer to domestic partners in this manner, there is no violation. See plaintiffs’ brief on appeal (Docket No. 133554), pp 27-29. We do not agree that whether the amendment is violated is a function of what label a public employer chooses to place on the beneficiaries of the benefits. Instead, the only pertinent question is whether the public employer is recognizing a domestic partnership as a union similar to marriage for any purpose.

 For example, the right to hold property as tenants by the entirety, MCL 557.71; an equal interest in property of every kind acquired during the marriage, MCL 557.204; the right to pension and retirement benefits accrued during the marriage, MCL 552.18; the right to claim an exemption on taxes for spousal inheritance, MCL 205.202; and the right to spousal veterans’ benefits, MCL 32.49d and MCL 36.31.

 Indeed, we agree with plaintiffs and the dissent that marriages and domestic partnerships are dissimilar in many respects. Marriages give rise to many legal rights and responsibilities that domestic partnerships do not. However, we believe the pertinent question for purposes of the marriage amendment is not whether these relationships give rise to identical, or even similar, legal rights and responsibilities, but whether these relationships are similar in nature in the context of the marriage amendment. The dissent, post at 99-100 n 50, fails to recognize that the pertinent question here is not whether marriages and domestic partnerships are similar in the abstract, but whether these relationships are similar for purposes of the marriage amendment, i.e., for the purpose of a constitutional provision that prohibits the recognition of unions similar to marriage “for any purpose.” If they are, then there can be no legal cognizance given to the similar relationship.

 Plaintiffs argue that the marriage amendment was adopted in response to Baker v State, 170 Vt 194; 744 A2d 864 (1999), in which the Vermont Supreme Court held that that state is constitutionally required to extend to same-sex couples in a civil union all the same benefits and protections that are provided to married couples. Thus, plaintiffs contend that the amendment only prohibits the establishment of “civil unions” that confer the same rights and obligations as does a marriage. However, as explained earlier, a union does not have to confer all the same rights and obligations as does a marriage in order to be “similar” to a marriage. Moreover, it is no less plausible that the amendment was adopted in response to a series of judicial decisions holding that public employers can extend health-insurance benefits to employees’ domestic partners. See, e.g., Tyma v Montgomery Co, 369 Md 497; 801 A2d 148 (2002); Heinsma v City of Vancouver, 144 Wash 2d 556; 29 P3d 709 (2001); Lowe v Broward Co, 766 So 2d 1199 (Fla App, 2000); Crawford v Chicago, 304 Ill App 3d 818; 710 NE2d 91 (1999); Slattery v New York City, 266 AD2d 24; 697 NYS2d 603 (1999); Schaefer v City of Denver, 973 P2d 717 (Colo App, 1998).

 Indeed, the Michigan State University policy specifically states that the partners must be of the “same-sex and for this reason are unable to marry each other under Michigan law[J” [Emphasis added.]

 See also MCL 551.1 (“A marriage contracted between individuals of the same sex is invalid in this state.”); MCL 551.2 (“Marriage is a civil contract between a man and a woman ... .”); MCL 551.3 (“A man shall not marry ... another man.”); MCL 551.4 (“A woman shall not many ... another woman.”); MCL 551.272 (“This state recognizes marriage as inherently a unique relationship between a man and a woman,... and therefore a marriage that is not between a man and a woman is invalid in this state regardless of whether the marriage is contracted according to the laws of another jurisdiction.”).

 Three of these policies specifically refer to blood relationships that would prevent “marriage.” The city of Kalamazoo’s policy provides that the partners cannot be “related by blood closer than would prevent marriageL]” The University of Michigan’s policy provides that the partners cannot be “related to each other by blood in a manner that would bar marriage[.]” Michigan State University’s plan provides that the partners cannot be “related to one another closely enough to bar marriage in Michigan[.]”

 MCL 551.3 provides:
“A man shall not marry his mother, sister, grandmother, daughter, granddaughter, stepmother, grandfather’s wife, son’s wife, grandson’s wife, wife’s mother, wife’s grandmother, wife’s daughter, wife’s granddaughter, brother’s daughter, sister’s daughter, father’s sister, mother’s sister, or cousin of the first degree, or another man.”

 MCL 551.4 provides:
“A woman shall not marry her father, brother, grandfather, son, grandson, stepfather, grandmother’s husband, daughter’s husband, granddaughter’s husband, husband’s father, husband’s grandfather, husband’s son, husband’s grandson, brother’s son, sister’s son, father’s brother, mother’s brother, or cousin of the first degree, or another woman.”

 At oral arguments, despite being asked several times to provide an example of another relationship in Michigan defined in terms of both gender and the lack of a close blood connection, plaintiffs’ counsel was unable to do so.

 Although we believe that these are the core qualities that make marriages and domestic partnerships similar, these relationships are similar in other respects as well. For instance, marriages and domestic partnerships are relationships that only two people may enter into. See MCL 551.5 (“No marriage shall be contracted whilst either of the parties has a former wife or husband living, unless the marriage with such former wife or husband, shall have been dissolved.”); OSE policy (domestic partners must “[n]ot have a similar relationship with any other person, and not have had a similar relationship with any other person for the prior six months”); City of Kalamazoo policy (domestic partners must “[f]ile a statement of termination of previous domestic partnership at least six (6) months prior to signing another Certification of Domestic Partnership”); University of Michigan policy (domestic partners must “[h]ave allowed at least six months to pass since the dissolution of a previous same-sex domestic partnership in the manner authorized by a municipality or other government entity”); Michigan State University policy (domestic partners must not be “legally married to others [or have] another domestic partner”).
In addition, persons involved in either marital or domestic-partnership relationships must undertake obligations of mutual support. See MCL 750.161(1) (“[A] person who being of sufficient ability fails, neglects, or refuses to provide necessary and proper shelter, food, care, and clothing for his or her spouse... is guilty of a felony----”); OSE policy (domestic partners must “[b]e jointly responsible for basic living expenses”); City of Kalamazoo policy (domestic partners must “[s]hare financial arrangements and daily living expenses related to their common welfare”); Michigan State University policy (domestic partners must be “jointly responsible to each other for the necessities of life”). Although the University of Michigan policy does not include a mutual-support obligation, it doqs require the partners to “[h]ave registered or declared the Domestic Partnership,” and the city of Ann Arbor’s “Declaration of Domestic Partnership” requires the parties to declare that “we are in a relationship of mutual support” and that “we sharethe common necessities of life.”
*74 Further, both marital and domestic-partnership relationships require agreements or contracts as a precondition. See MCL 551.2 (“Marriage is a civil contract between a man and a woman, to which the consent of parties capable in law of contracting is essential.”); OSE policy (domestic partners must “agree that they are jointly responsible” “for basic living expenses”); City of Kalamazoo policy (domestic partners must be “mentally competent to enter into a contract” and must sign a domestic-partnership agreement); University of Michigan policy (domestic partners must sign a domestic-partnership agreement); Michigan State University Policy (domestic partners must “provide a signed ‘partnership agreement’ ”). See part 111(E) of this opinion.
Additionally, both marital and domestic-partnership relationships have a minimum age requirement. See MCL 551.51 (“A marriage in this state shall not be contracted by a person who is under 16 years of age....”); OSE policy (domestic partners must “[b]e at least 18 years of age”); City of Kalamazoo policy (domestic partners must “[b]e at least 18”); Michigan State University policy (domestic partners must be “at least 18 years of age”). Although the University of Michigan’s policy does not include an age requirement, it does require the partners to “[h]ave registered or declared the Domestic Partnership,” and the city of Ann Arbor’s “Declaration of Domestic Partnership” requires the parties to be “at least 18 years of age____”
Further, both marriages and domestic partnerships are relationships of an indefinite duration. That is, they are both ongoing relationships that continue until one of the parties takes affirmative action to terminate the relationship. See MCL 552.6 (one must file a complaint for divorce in order to dissolve a marriage); OSE policy (domestic partners must “jointly share[] the same ... residence ... and have an intent to continue doing so indefinitely”); City of Kalamazoo policy (domestic partners must “[fjile a statement of termination of previous domestic partnership ... prior to signing another Certification of Domestic Partnership”); University of Michigan policy, (domestic partners must “[h]ave allowed at least six months to pass since the dissolution of a previous same-sex domestic partnership in the manner authorized by a municipality or other government entity”); Michigan State University policy (domestic partners must be “in a long-term committed relationship, have been in the relationship for at least 6 months, and intend to remain together indefinitely”).
Finally, it seems relevant that all but one of the domestic-partnership policies at issue here require the partners to share a common residence, a circumstance typically defining the marital relationship as well. See OSE policy (domestic partners must “share[] the same regular and *75 permanent residence”); City of Kalamazoo policy, (domestic partners must “[s]hare a common residence”); Michigan State University policy (domestic partners must “share a residence”).

 It is noteworthy in this regard that the city of Kalamazoo’s policy specifically states that “[i]t is the intent of this program to provide insurance coverage and other benefits to domestic partners of the City of Kalamazoo identical to those provided to spouses of City employees.” (Emphasis added.) Indeed, each of the four policies at issue here specifically refers to marriage or spouses, and the Michigan State University policy specifically refers to marriage in three different provisions. If domestic partnerships are not similar to marriage, why would there be the need in each of these agreements to invoke marriage as an apparently analogous or comparable institution?

 Plaintiffs themselves acknowledge that public employers recognize a domestic partnership by providing health-insurance benefits to their employees’ domestic partners on the basis of the partnership. See plaintiffs’ brief on appeal (Docket No. 133554), p 26 (“What these employers have recognized ... is that a relationship exists between one of their employees and another individual.”; “in recognizing the existence of that relationship and making that relationship the basis for the employment related benefits which are at issue”; “[T]hese institutions may be giving recognition to the relationship that exists between their employees and their partners.”) (emphasis added and omitted).

 In addition, all the policies except the University of Michigan’s require partners to five together. When two people decide to live together, they have clearly reached a “mutual arrangement.”

 Reasonable people doubtlessly can disagree regarding whether health-insurance benefits are or are not a benefit of marriage. On the one hand, one can argue that health-insurance benefits are not a benefit of marriage because they arise out of the employer-employee relationship rather than the marital relationship, as demonstrated by the fact that not all married couples have health-insurance benefits. On the other hand, one can argue that they are a benefit of marriage, as demonstrated by the fact that a significant number of people obtain such benefits from their spouses’ employers while they would be unable to obtain such benefits if they were not married. Resolution of this disagreement depends, in part, on whether the term “benefit of marriage” implies an exclusive benefit or merely a typical benefit. Nonetheless, for the reasons set forth in this part of our opinion, we believe that the people have resolved this disagreement, or at least rendered it moot, in the operative part of the amendment. There, it is made clear that domestic partnerships will not be given legal cognizance “for any purpose,” including presumably for the purpose of providing health-insurance benefits.

 It is also of some interest that the preamble concerning the benefits of marriage was not even on the ballot when the amendment was ratified. The only language on the ballot was the operative part of the amendment. Although we cannot conclude from this fact that the people did not adopt the entire amendment, such a ballot presentation seems to underscore the traditional view of preamble provisions. See n 20 infra.

 This view of the preamble is consistent with the well-established rule that “the preamble is no part of the act, and cannot enlarge or confer powers, nor control the words of the act, unless they are doubtful or ambiguous ... .” Yazoo & M V R Co v Thomas, 132 US 174, 188; 10 S Ct 68; 33 L Ed 302 (1889); see also Coosaw Mining Co v South Carolina, 144 US 550, 563; 12 S Ct 689; 36 L Ed 537 (1892) (“While express provisions in the body of an act cannot be controlled or restrained by the ... preamble, [it] may be referred to when ascertaining the meaning of a [provision] which is susceptible of different constructions.”). That is, a “ ‘preamble no doubt contributes to a general understanding of a [provision], but it is not an operative part of the [provision],’ ” and “ ‘[w]here the enacting or operative parts of a [provision] are unambiguous, the meaning of the [provision] cannot be controlled by language in the preamble.’ ” Nat’l Wildlife Federation v EPA, 351 US App DC 42, 57-58; 286 F3d 554 (2002) (citations omitted); see also United States v Emerson, 270 F3d 203, 233 n 32 (CA 5, 2001) (“ ‘[T]hough the preamble cannot control the enacting part of a [provision], which is expressed in clear and unambiguous terms, yet, if any doubt arise on the words of the enacting part, the preamble may be resorted to, to explain it.’ ”) (citation omitted); Planned Parenthood of Minnesota v Minnesota, 910 F2d 479, 482-483 (CA 8, 1990); White v Investors Mgt Corp, 888 F2d 1036, 1042 (CA 4, 1989); Atlantic Richfield Co v United States, 764 F2d 837, 840 (Fed Cir, 1985); Hughes Tool Co v Meier, 486 F2d 593, 596 (CA 10, 1973). Similarly, see Parker v Dist of Columbia, 375 US App DC 140, 159-160; 478 F3d 370 (2007) (reasoning that the preamble of the Second Amendment [“[a] well regulated Militia, being necessary to the security of a free State,”] could not override the clear substantive guarantee of the Second Amendment [“the right of the people to keep and bear Arms, shall not be infringed”]), cert gtd sub nom Dist of Columbia v Heller, _ US _; 128 S Ct 645 (2007); see also Jacobson v Massachusetts, 197 US 11, 22; 25 S *80 Ct 358; 49 L Ed 643 (1905) (holding that the preamble of the United States Constitution is not a source of governmental power).

 Contrary to the dissent’s contention, post at 95 n 34, the fact that the amendment does not explicitly state that public employers are prohibited from providing health benefits to their employees’ domestic partners does not mean that the amendment is “ambiguous.” That is, the fact that *81 a constitutional provision does not explicitly set forth every specific action that is prohibited does not mean that such a provision is ambiguous. If that were the case, almost all constitutional provisions would be rendered ambiguous. Rather, as this Court explained in Lansing Mayor v Pub Service Comm, 470 Mich 154, 166; 680 NW2d 840 (2004):
[A] provision of the law is ambiguous only if it “irreconcilably conflict[s]” with another provision or when it is equally susceptible to more than a single meaning. In lieu of the traditional approach to discerning “ambiguity” — one in which only a few provisions are truly ambiguous and in which a diligent application of the rules of interpretation will normally yield a “better,” albeit perhaps imperfect, interpretation of the law — the dissent would create a judicial regime in which courts would be quick to declare ambiguity and quick therefore to resolve cases and controversies on the basis of something other than the words of the law. [Citation omitted; emphasis in the original.]

 As an aside, this brochure did not render a verdict on the instant controversy. Rather, it stated:
Marriage is a union between a husband and wife. Proposal 2 will keep it that way. This is not about rights or benefits or how people choose to five their life. This has to do with family, children and the way people are. It merely settles the question once and for all what marriage is — for families today and future generations.
*82 We do not read this language as resolving that the marriage amendment would not prohibit domestic partners from obtaining health-insurance benefits. Moreover, statements made by other supporters of the amendment stated that partnership benefits would, in fact, be prohibited by the amendment. See amicus curiae brief of the American Family Association of Michigan, pp 6-8.
In addition to the brochure, plaintiffs and the dissent rely on statements made by counsel for Citizens for the Protection of Marriage to the Board of State Canvassers in which he apparently asserted that the amendment would not prohibit public employers from providing health-insurance benefits to domestic partners. Post at 92-93, quoting the transcript of the August 23, 2004, hearing before the board, reproduced in the Governor’s appendix (Docket No. 133429), p 68a. Whatever the accuracy of this characterization, cf. amicus curiae brief of the American Family Association of Michigan, p 8 n 2, it should bear little repeating that the people ultimately did not cast their votes to approve or disapprove counsel’s, or any other person’s, statements concerning the amendment; they voted to approve or disapprove the language of the amendment itself.
Moreover, given that the “Board of State Canvassers... has the authority only to ‘ascertain if the petitions have been signed by the requisite number of qualified and registered electors,’ ” Michigan Civil Rights Initiative, 475 Mich at 903 (Markman, J., concurring), quoting MCL 168.476(1), we are not sure why the dissent places particular emphasis,post at 92 n 22, on the fact that this statement was made before the Board of State Canvassers.

 Other opponents made similar statements concerning the adverse consequences of the amendment. See, generally, amicus curiae brief of the American Family Association of Michigan, pp 9-12. The dissent contends that “[i]t is reasonable to assume that the public relied heavily on the proponents of the amendment to explain its meaning and scope.” *83 Post at 96 n 35. We see no basis for this argument. Contrary to the dissent, it is no more likely that the voters relied on proponents’ views rather than opponents’ views of the amendment. Indeed, one might conceivably think that at least some of the people would be significantly more likely to rely on an assessment of the amendment from an official agency of the government than from a private organization with an obvious stake in the passage of the amendment. Similarly, it might be ejected that at least some might be influenced by the characterizations of newspapers such as the Detroit Free Press, in which its political columnist stated in a question-answer format on September 13, 2004:
Q. What about employee benefits accorded to domestic partners and their dependents by some municipalities and public universities?
A. Proponents and opponents of the amendment say they would be prohibited to the extent they mimic benefits for married employees.
Because we cannot read voters’ minds to determine whose views they relied on and whose they ignored — and because in the end this would not be relevant — we must look to the actual language of the amendment. The dissent inadvertently illustrates the principal infirmity of reliance upon legislative history, namely that it affords a judge essentially unchecked discretion to pick and choose among competing histories in order to select those that best support his own predilections. In relying on what she describes as the “wealth of extrinsic information available,” post at 95 n 34, the dissenting justice refers only to information supporting her own viewpoint, while disregarding the abundant “wealth of extrinsic information” that does not.

 It perhaps can also be discerned that supporters of legislative and constitutional initiatives often tend to downplay the effect of such initiatives during public debate, while opponents tend to overstate their effect.

 The dissent chastises us for failing to consider extrinsic evidence, given that we considered such evidence in People v Nutt, 469 Mich 565, 588-592; 677 NW2d 1 (2004), and Lapeer Co Clerk v Lapeer Circuit Court, 469 Mich 146, 156-160; 665 NW2d 452 (2003). Post at 95 n 34. In those cases, we considered the Official Record of the Constitutional Convention and the Address to the People. These are hardly comparable to campaign statements made by private organizations. Further, we recognized in those cases that “constitutional convention debates and the Address to the People ... are... not controlling.” Lapeer Co Clerk, 469 Mich at 156. To say the least, neither case stands for the dissent’s apparent proposition that any stray bit of historical flotsam or jetsam can serve as guidance in giving meaning to the constitution. In a similar vein, the dissent would trump the actual language of the constitution by relying on a telephone survey conducted three months before the election that indicated that a majority of those surveyed were not opposed to domestic-partnership benefits.

 Because the other issues addressed by the Court of Appeals were not appealed in this Court, we do not address them.