# STATE OF MICHIGAN

# COURT OF APPEALS

SS Next Friend of Minor LM, DS Next Friend of
Minor SD, MJ Next Friend of Minor MS, DC Next
Friend of Minor LB, TF Next Friend of Minors
DF, ID, and FC, LH Next Friend of Minor CM,

      Plaintiffs-Appellees,

v

STATE OF MICHIGAN, STATE BOARD OF
EDUCATION, DEPARTMENT OF
EDUCATION, and STATE SUPERINTENDENT
OF PUBLIC INSTRUCTION,

      Defendants-Appellants,

and

HIGHLAND PARK SCHOOL DISTRICT,
HIGHLAND PARK SCHOOL DISTRICT
EMERGENCY MANAGER, HIGHLAND PARK
PUBLIC SCHOOL ACADEMY SYSTEM, and
LEONA GROUP, L.L.C.,

      Defendants.

FOR PUBLICATION
November 6, 2014

Nos. 317071; 317072
Wayne Circuit Court
LC No. 12-009231-CZ

SS Next Friend of Minor LM, DS Next Friend of
Minor SD, MJ Next Friend of Minor MS, DC Next
Friend of Minor LB, TF Next Friend of Minors
DF, ID, and FC, and LH Next Friend of Minor
CM,

      Plaintiffs-Appellees,

v

No. 317073
Wayne Circuit Court
LC No. 12-009231-CZ

-1-

STATE OF MICHIGAN, STATE BOARD OF
EDUCATION, DEPARTMENT OF
EDUCATION, STATE SUPERINTENDENT OF
PUBLIC INSTRUCTION, HIGHLAND PARK
PUBLIC SCHOOL ACADEMY SYSTEM, and
LEONA GROUP, L.L.C.,

        Defendants,

and

HIGHLAND PARK SCHOOL DISTRICT and
HIGHLAND PARK SCHOOL DISTRICT
EMERGENCY MANAGER,

        Defendants-Appellants.

---

Before:  MURRAY, P.J., and JANSEN and SHAPIRO, JJ.

MURRAY, P.J. (concurring).

In their briefs filed with this Court plaintiffs have set forth evidence that they are not educated to the level that would be reasonably expected given their ages.  This evidence should be of great concern to their parents, school authorities, and frankly any taxpayer or other concerned citizen.  But those important educational concerns are not what we, a court of law, are addressing today, for our exclusive task is to determine whether plaintiffs can pursue the legal theories set forth in their complaint.  The majority opinion adequately explains why they cannot. I write separately to briefly address some of the more specific arguments put forth by plaintiffs.

First, as made clear during oral argument before this Court, plaintiffs' constitutional arguments are not anchored in the text of either Const 1963, art 8 § 1 or § 2, yet it is that text that we must apply in determining whether plaintiffs can maintain a claim under these state constitutional provisions.[1]  It is plain that nothing in either § 1 or § 2 of Article 8 even touches upon the specific issues about which plaintiffs complain.  Instead, as the majority opinion makes clear, those provisions only articulate general aspirational propositions that are to guide the Legislature's enactment of legislation containing more specific education policy choices.[2]  In no

---

[1] To prevail against the state, plaintiffs would also have to show that any injury they suffered was caused by a state custom or policy, *Jones v Powell*, 462 Mich 329, 336; 612 NW2d 423 (2000), but that issue need not be addressed because there is no basis in the text for these claims.

way can they be legitimately read to support a *constitutional* right to specific educational results or to a guarantee of a certain level of education.

Second, plaintiffs maintain that their argument *is* supported by the text, as least in so far as the Michigan Supreme Court has construed § 2. In that regard, plaintiffs argue that in *Bond v Ann Arbor Sch Dist*, 383 Mich 693; 178 NW2d 484 (1970), our Supreme Court recognized a cause of action under Article 8, § 2. It is certainly true that the *Bond* Court upheld the plaintiffs' challenge under Article 8, § 2, that the school district was required to pay for books their children would use in public school. See *Bond*, 383 Mich at 699-702. But, in our decision today, we are assuming a direct cause of action can be brought under this provision. The question is whether plaintiffs' allegations make out a potential violation of these constitutional provisions, and in that regard *Bond* is of no assistance. *Bond* addressed a challenge invoking precise language in the constitutional provision—what was meant by a "free" public education— while plaintiffs in this case can point to no language in the text that supports their challenge seeking to establish a specific level or quality of education through the provision of a free public education. Thus, *Bond's* analysis does not help here.[3]

Third, as the majority opinion makes clear, the statutory provision raised by plaintiffs, MCL 380.1278(8), is not amenable to mandamus relief. To implement that provision, which is itself a legislative remedy for poor reading performances as it compels school districts to provide "special assistance reasonably expected to enable the pupil to bring his or her reading skills to grade level within 12 months," requires an enormous amount of discretion on the part of educators. On this point, it bears emphasizing what both the United States Supreme Court and our state Supreme Court have repeatedly held: judges are not equipped to decide matters of educational policy. See, e.g., *Parents Involved In Community Schs v Seattle Sch Dist No 1*, 551 US 701, 849; 127 S Ct 2738; 169 L Ed2d 508 (2007), citing *inter alia*, *San Antonio Indep Sch Dist v Rodriguez*, 411 US 1, 49-50; 93 S Ct 1278; 36 L Ed 2d 16 (1973); *Wisconsin v Yoder*, 406 US 205, 235; 92 S Ct 1526; 32 L Ed 2d 15 (1972); *Page v Klein Tools, Inc*, 461 Mich 703, 715-716; 610 NW2d 900 (2000); *Larson v Burmaster*, 295 Wis 2d 333, 368; 720 NW2d 134; 2006 Wis App 142 ( 2006).

This holds true whether we are addressing mandamus relief or trying to define what specific level of education is required by the Constitution. Indeed, in Michigan—like most

[2] Indeed, Article 8, § 2 states that the Legislature shall maintain and support free public schools "as defined by law," which means that the public school system called for in § 2 is to be implemented by the Legislature. See *Midland Cogeneration Venture Ltd Partnership v Naftaly*, 489 Mich 83, 93-94; 803 NW2d 674 (2011); *People v Perks (On Remand)*, 259 Mich App 100, 113; 672 NW2d 902 (2003). This implies that a judicial monetary remedy for a violation of the general standards of § 2 would be inappropriate to recognize. *Lewis v Michigan*, 464 Mich 781, 787; 629 NW2d 868 (2001).

[3] The dissent asserts that *Bond* applies to plaintiffs' allegation that "[t]here is a critical lack of textbooks in most classrooms." *Bond*, however, only addressed whether under Article 8, § 2 a school district could require parents to pay for required textbooks, not the unrelated and policy driven question as to how many textbooks are sufficient for a particular class. And, plaintiffs do not allege that the school district is charging them for any of the textbooks.

states—what type of programs should be utilized to implement the general guarantees of Article 8, § 1 and § 2, is a decision primarily left to either the state legislature or locally elected school district boards of education. *Slocum v Holton Bd of Ed*, 171 Mich App 92, 95-96; 429 NW2d 607 (1988); *Sheridan Road Baptist Church v Dep't of Ed*, 132 Mich App 1, 21; 348 NW2d 263 (1984), aff'd 426 Mich 462 (1986). Those elected bodies have the capacity to conduct a number of tasks to address these important issues, including the ability to hear different policy arguments, listen to arguments for or against specific educational programs, allow the taking of testimony, and to receive input from teachers and constituents, to name just a few. See, e.g., *Henry v Dow Chem Co*, 473 Mich 63, 92 n 24; 701 NW2d 684 (2005). We, the judiciary, do not have that same capacity, ability, or role, as we serve a significantly different and limited function in state government. *Id*.

Fourth, and finally, plaintiffs offer a number of decisions from our Sister States holding that their state constitutions provide a guaranteed minimal level of education. It is certainly true that some state appellate courts have come to that conclusion. But it is just as true that, as most of those courts recognize, these decisions are "necessarily controlled in large measure by the particular wording of the constitutional provisions of those states' charters regarding education . . . ." *Tennessee Small Sch Sys v McWherter*, 851 SW2d 139, 148 (Tenn, 1993). As the Iowa Supreme Court highlighted, many state constitutions' education clauses contain words like "adequate," "efficient," "quality" or "thorough" that denote a level of quality to the education provided, *King v Iowa*, 818 NW2d 1, 20-21, 21 n 16 (Iowa, 2012), but as discussed our provisions contain no such verbiage. Many of the other cases relied upon by plaintiffs address funding level issues, and that issue—as plaintiffs have argued—is not a part of this lawsuit.[4] And if that issue was raised, plaintiffs would have a tough hurdle to overcome. See *Governor v State Treasurer*, 390 Mich 389; 212 NW2d 711 (1973) *(Governor II)* and *East Jackson Pub Schs v Michigan*, 133 Mich App 132, 137-138; 348 NW2d 303 (1984).

To the extent some courts have concluded that general, "aspirational" language similar to our language does call for minimum levels of educational results, I simply disagree with those decisions. I cannot by judicial fiat read words like "sufficient," "adequate" or "quality" into the text of Article 8, § 2, no matter how sound the result of doing so might seem,[5] when those words were not ratified by the people themselves. *Nat'l Pride At Work, Inc v Governor*, 481 Mich 56, 68; 748 NW2d 524 (2008). That is not the proper function of the judiciary. We are neither equipped with the power nor the expertise to determine what courses, teaching credentials, staffing levels, etc., are necessary to provide whatever would be determined to be an "adequate

---

[4] The following cases are therefore not analogous to the present controversy, at least in so far as they deal with the adequacy of legislative funding: *Leandro v North Carolina*, 346 NC 336, 342-343; 488 SE2d 249 (1997), *Tennessee Small Sch Sys*, 851 SW2d at 148-149, *Abbott v Burke*, 119 NJ 287, 314; 575 A2d 359 (1990), and *Rose v Council for Better Ed, Inc*, 790 SW2d 186 (Ky, 1989).

[5] After all, no sane individual would oppose the proposition that Michigan schools should provide a quality education for all, particularly when so many financial resources are already provided to K-12 public education.

education." In the end, the constitutionally appropriate forum for plaintiffs is the ballot box, not the courts. "Voters elect our governor, legislators, and school board members. If these plaintiffs do not like how [Highland Park] schools are run, they should turn to the ballot box, not the courts." *King*, 818 NW2d at 43 (WATERMAN, J., concurring).[6] See, also, *Smith v Henderson*, ___ F Supp 2d ___, ___ (D DC, 2014) ("The core problem here is that the parents' fight is one for the ballot box—not the courts.").

The dissent's vituperative opinion glosses over many of the important legal distinctions that control the outcome of this case as framed by plaintiffs. Though all of us agree that the evidence of prior performance in the school district amongst this segment of students was poor, as members of the judiciary we cannot let our moral, political or emotional views of that situation obscure the rule of law that we must apply. *Planned Parenthood of Greater Iowa, Inc v Miller*, 30 F Supp 2d 1157, 1160 (SD Iowa, 1998), aff'd 195 F3d 386 (CA 8, 1999). That said, several points must be made in response to the dissenting opinion.

First, the majority opinion is not leaving plaintiffs without a remedy. A remedy exists, it is simply not to be found, under these constitutional provisions and statute, in the court system. Instead, as previously made clear, the Michigan Constitution itself indicates that it is the Legislature that is to define the scope of the public education that Michigan children are entitled to, as the key phrase within Article 8, § 2, "as provided by law," indicates. See footnote 2 and *King v Oakland Co Prosecutor*, 303 Mich App 222, 241; 842 NW2d 403 (2013). That delegation, coupled with the generalized language of the provision itself, compels the conclusion that *what level* of education is mandated by the Constitution is for the legislative branch to decide.

Second, and relatedly, the dissent offers a definition of "education" that we should utilize to define that term in Article 8, § 2. Assuming that definition was the common meaning at the time the Constitution was ratified in 1963, *Nat'l Pride At Work*, 481 Mich at 67, the definition offered by the dissent does not itself speak to a particular level of education required. Rather, it merely defines the ultimate goal of education, i.e., "developing" the knowledge, skills, minds and character of our youth. It provides no gauge as to the level of education to be provided and, as a result, how courts are to enforce such vague provisions.[7] And this again highlights the significant obstacle that plaintiffs face in this case: the remedy. To judicially impose a remedy

---

[6] At least one elected official, Governor Snyder, has acted pursuant to legislation (MCL 141.1541 *et seq*.) by appointing an emergency manager to oversee certain of the school district's operations in an attempt to remedy many of the problems that have plagued the district.

[7] Moreover, the dissent's reliance upon the "adequate education" phrase from *Governor II*, 390 Mich at 389, is greatly misplaced. That second decision was simply an order declaring that the prior opinion addressing the governor's request for answers to certified questions, *Governor v State Treasurer*, 389 Mich 1; 203 NW2d 457 (1972) *(Governor I)*, opinions vacated 390 Mich 389, had been improvidently granted. The opinion issued with the order that contains the phrase cited by the dissent, was signed by only two justices who agreed with the dismissal and vacating of the prior opinion, and thus their opinion was plainly dicta that commanded no majority.

will either immediately, or inevitably, lead the courts into the forbidden territory of educational policy making.

For example, say a school district's seventh graders average 55 percent on a math assessment test, and a court concluded that the district (not the state) was not sufficiently "developing" the students' minds, at least as it pertained to math. The dissent opines that an order simply declaring that the minimum level was not attained would suffice, and the school district—perhaps with assistance from the state—could develop ways to improve. But to what level? A 60, 70 or 80 percent average? What about a 100 percent passing average? What curriculum should be used to obtain these higher averages? Should there be a lower teacher to student ratio for those students who have performed below the average? And, if the first attempt is unsuccessful in reaching that subjective goal, when will the court—through use of experts— start deciding what method would be *more appropriate* for the district to implement next in the name of complying with its order? Court supervision of the district's teaching methods and curriculum would be inevitable, yet that is precisely what the Supreme Courts of this state and nation have warned against. See *Yoder*, 406 US at 235; *Page*, 461 Mich at 715-716. The Illinois Supreme Court properly articulated these same constitutional concerns in *Lewis E v Spagnolo*, 186 Ill 2d 198, 209; 238 Ill Dec 1; 710 NE2d 798 (1999):

> Attempting to distinguish "high quality" from "minimally adequate" in this context is nothing more than semantics. No matter how the question is framed, recognition of the plaintiffs' cause of action under the education article would require the judiciary to ascertain from the constitution alone the content of an "adequate" education. The courts would be called upon to define what minimal standards of education are required by the constitution, under what conditions a classroom, school, or district falls below these minimums so as to constitute a "virtual absence of education," and what remedy should be imposed. Our decision in *Committee for Educational Rights* [*v Edgar*, 174 Ill 2d 1; 220 Ill Dec 166; 672 NE2d 1178 (1996)] made clear that these determinations are for the legislature, not the courts, to decide.

See, also, *Nebraska Coalition for Educational Equity & Adequacy v Heineman*, 273 Neb 531, 553-554; 731 NW2d 164 (2007).

In sum, whether it is a good or bad policy choice, the ratifying voters in 1963 gave the Legislature full authority to define the public education to be provided by school districts. The Legislature responded with, amongst other things, the very detailed Revised School Code. See MCL 380.1 *et seq*. Many of the statutes in that code contain remedies to be employed by districts once certain low scores occur, as is the case with MCL 380.1278(8). But, mandamus is not an appropriate way to enforce that provision because of the built-in discretion required to implement that statute and because a decision by the school district as to those qualifying plaintiffs has been made and implemented; plaintiffs are challenging the decision made and asserting that there are better programs for the school district to utilize in implementing the

"special assistance" under the statute[8]. As a consequence, the children—through their parents— have a remedy; it is just not with the courts under the claims pleaded by plaintiffs.

/s/ Christopher M. Murray

---

[8] Hence, this case is a far cry from what was at issue in *Teasal v Dep't of Mental Health*, 419 Mich 390, 410; 355 NW2d 75 (1984), where no decision had been made by defendant under established criteria.