MARKMAN, J.
(concurring in part and dissenting in part). I agree with the majority opinion to the extent that it holds that the Fifth Amendment does not preclude the use of false statements by a law enforcement officer in a prosecution for obstruction of justice. However, I respectfully disagree with it to the extent that it holds that the disclosures by law enforcement officers act (DLEOA), MCL 15.391 et seq., precludes the use of false statements by a law enforcement officer in a prosecution for obstruction of justice. That is, contrary to the majority, I agree with the Court of Appeals that false statements do not constitute “information” and therefore are not protected by the DLEOA, which only protects “information.” Accordingly, I would affirm the judgment of the Court of Appeals.
I. PACTS AND HISTORY
The defendant police officers, Sean Harris, William Little, and Nevin Hughes, were charged with obstruction of justice for lying during an internal investigation of Hughes, who had assaulted Dajuan Hodges-Lamar. The assault was video recorded by a security camera at a gas station.[1] Defendants argued that the Fifth Amendment and the DLEOA prohibit the prosecutor *360 from using the statements they made during the investigation. Before defendants provided their statements, the investigating officer provided each with a standard departmental notification-of-constitutional-rights form. This form stated, in relevant part, “If I refuse ... to answer questions . . . , I will be subject to departmental charges which could result in my dismissal from the police department,” and “[i]f I do answer . . ., neither my statements or any information or evidence which is gained by reason of such statements can be used against my [sic] in any subsequent criminal proceeding.”[2] Each defendant signed the form and then proceeded to lie, stating that defendant Hughes did not have any physical contact with Hodges-Lamar apart from a pat-down search. The video recording showed otherwise.
The district court dismissed the obstruction-of-justice charges on the basis that defendants’ statements to the investigating officer could not be used against them under the DLEOA and the Fifth Amendment,[3] and the circuit court affirmed. In a published and split decision, the Court of Appeals reversed and reinstated the obstruction-of-justice charges against *361 all three defendants, holding that neither the Fifth Amendment nor the DLEOA prohibits the prosecutor from using the statements made by defendants during the investigation. People v Hughes, 306 Mich App 116; 865 NW2d 209 (2014). Judge WILDER concurred in part and dissented in part. He agreed with the majority that the Fifth Amendment does not prohibit the prosecutor from using defendants’ statements, but concluded that the DLEOA does prohibit the prosecutor from using defendants’ statements. This Court then granted defendants’ applications for leave to appeal. People v Harris, 497 Mich 958 (2015).
II. ANALYSIS
A. THE FIFTH AMENDMENT
The Fifth Amendment provides that no person “shall be compelled in any criminal case to be a witness against himself. . . .” US Const, Am V (emphasis added); see also Const 1963, art 1, § 17.[4] In Garrity v New Jersey, 385 US 493; 87 S Ct 616; 17 L Ed 2d 562 (1967), several police officers were investigated by the New Jersey Attorney General for fixing traffic tickets. *362 After having been warned that if they refused to answer questions they would be subject to removal from office, the officers answered the questions asked of them during the investigation. Id. at 494-495. The Court held that their answers were “compelled” within the meaning of the Fifth Amendment and therefore that the statements could not be used against them in subsequent prosecutions for conspiracy to obstruct the administration of the traffic laws. Id. at 497-500. The Court explained that “protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic.” Id. at 500.[5]
However, in United States v Wong, 431 US 174, 179; 97 S Ct 1823; 52 L Ed 2d 231 (1977), the United States Supreme Court held that “the Fifth Amendment privilege does not protect perjury . . . .” Instead, “ [i] t grants a privilege to remain silent without risking contempt, but it ‘does not endow the person who testifies with a license to commit perjury.’ ” Id. at 178 (citation omitted). Therefore, the Court held that the defendant’s false testimony was admissible in a subsequent perjury trial even though the defendant had provided the false testimony without being informed of her Fifth Amendment right to remain silent.[6] “[E]ven the pre *363 dicament of being forced to choose between incriminatory truth and falsehood, as opposed to refusing to answer, does not justify perjury.” Id. at 178. “[B]y answering falsely the [defendant] took ‘a course that the Fifth Amendment gave [defendant] no privilege to take.’ ” Id. at 178-179 (citation omitted). “Indeed, even if the Government could, on pain of criminal sanctions, compel an answer to its incriminating questions, a citizen is not at liberty to answer falsely.” Id. at 180. “If the citizen answers the question, the answer must be truthful.” Id.
Similarly, in United States v Apfelbaum, 445 US 115, 117, 131; 100 S Ct 948; 63 L Ed 2d 250 (1980), the United States Supreme Court held that the “proper invocation of the Fifth Amendment privilege against compulsory self-incrimination allows a witness to remain silent, but not to swear falsely,” and thus “neither the [federal use-immunity] statute[7] nor the Fifth Amendment precludes the use of respondent’s immunized testimony at a subsequent prosecution for making false statements . . . .” That is, “perjury prosecutions are permissible for false answers to questions following the grant of immunity” because “the Fifth Amendment privilege against compulsory self-incrimination provides no protection for the commission of perjury . . . .” Id. at 126-127. See also McKinley v City of Mansfield, 404 F3d 418, 427 (CA6, 2005) (“As a matter of Fifth Amendment right, Garrity precludes *364 use of public employees’ compelled incriminating statements in a later prosecution for the conduct under investigation. However, Garrity does not preclude use of such statements in prosecutions for the independent crimes of obstructing the public employer’s investigation or making false statements during it.”) (citation omitted); id. (“[T]he Fifth Amendment permits the government to use compelled statements obtained during an investigation if the use is limited to a prosecution for collateral crimes such as perjury or obstruction of justice.”).
In light of this caselaw, it is clear that the Fifth Amendment does not protect a defendant from a subsequent prosecution for perjury or obstruction of justice predicated on false statements that the defendant made after having been granted immunity from prosecution.[8] Therefore, defendants’ false statements are not inadmissible under the Fifth Amendment. As a result, I agree with the Court of Appeals that
[t]he Fifth Amendment did not bar the admission of defendants’ false statements in the instant prosecutions for obstruction of justice. The district court abused its discretion by relying on the Fifth Amendment to exclude defendants’ false statements from evidence. [Hughes, 306 Mich App at 128.]
B. DLEOA
The Court of Appeals also held that the DLEOA does not bar admission of defendant’s false statements, and again I agree. MCL 15.393 of the DLEOA provides:
*365 An involuntary statement made by a law enforcement officer, and any information derived from that involuntary statement, shall not be used against the law enforcement officer in a criminal proceeding.[9]
1. “INFORMATION”
MCL 15.391 defines the term “involuntary statement” as “information provided by a law enforcement officer, if compelled under threat of dismissal from employment or any other employment sanction. . . .” (Emphasis added.) “Information” is defined as “1. knowledge communicated or received concerning a particular fact or circumstance; news. 2. Knowledge gained through study, communication, research, instruction, etc.; data; facts.” Random House Webster’s College Dictionary (1992).[10] In turn, “knowledge” is *366 defined as “acquaintance with facts, truths, or principles[.]” Id. (emphasis added).[11] As the Court of Appeals explained:
The phrase “involuntary statement” is defined as “information provided by a law enforcement officer, if compelled under threat of dismissal from employment or any other employment sanction, by the law enforcement agency that employs the law enforcement officer.” MCL 15.391(a) (emphasis added). But when an officer is compelled to make a statement during an internal investigation, and provides only misinformation and lies, he or she has not provided any “information” at all within the commonly understood meaning of that word. Among other things, “information” is defined as “knowledge communicated or received concerning a particular fact or circumstance.” Random. House Webster’s College Dictionary (1997). The word “knowledge,” in turn, is defined as “the body of truths or facts accumulated in the course of time.” Id. Because an officer’s lies do not impart any truths or facts, they necessarily do not constitute “information.” See MCL 15.391(a).[12] In other words, an officer’s lies and *367 false statements do not qualify as “involuntary state-mentfe]” under MCL 15.393, and consequently may be used as evidence in a subsequent criminal prosecution. [Hughes, 306 Mich App at 129-130.]
Judge WILDER concurred with the Court of Appeals majority regarding the Fifth Amendment issue, but dissented on the statutory issue on the basis that lies constitute “information.” As already explained, I agree with the Court of Appeals majority that lies do not constitute “information” as that term is commonly understood.[13] In other words, I do not believe most people would reasonably conclude that a person has provided them with “information” if all that the other person has done is tell them lies.[14]
*369 Judge WILDER concluded that because “misinform” is defined as “giv[ing] false or misleading information,” Random House Webster’s College Dictionary (1997), “the term ‘information’ as used in MCL 15.393 must be interpreted to include the giving of ‘misinformation.’ ” Hughes, 306 Mich App at 134 (WILDER, J., concurring in part and dissenting in part). I respectfully disagree. “Mis” is a prefix meaning the “opposite,” “lack of,” or negative of something. Merriam Webster’s Collegiate Dictionary (11th ed).[15] Therefore, “misinformation” constitutes the “opposite” of “information,” and because “misinformation” means “false or misleading information,” it follows that “information” means true or accurate information.[16] Contrary to the contentions of Judge WILDER and now the majority in this Court, “misinformation” by its prefix signifies that it is com *370 paring itself to “information;” it is not referring to a subset, a type, or a class, of “information.”
Judge WILDER and the majority in this Court also rely on the fact that a number of Michigan statutes refer to “inaccurate” or “misleading” information. See, e.g, MCL 769.34(10); MCL 750.492a(l); MCL 168.467b(6); MCL 487.2140(2); MCL 791.235(l)(b). However, I believe that this actually supports the Court of Appeals majority’s conclusion that “information” signifies truthful information because in those unusual circumstances in which the Legislature is intending to refer to untruthful information, it expressly refers to “inaccurate” or “misleading” information. That is, the Legislature recognizes that when it intends to refer to untruthful information, it needs to supply a modifier to precede “information” because, when unmodified, “information” signifies truthful information.[17] The Legislature’s affirmative and specific references to “inaccurate” or “misleading” information in the previously cited provisions in contrast to the absence of such modifying terms in MCL 15.391 evidences its intention to limit the DLEOA’s protection to “information,” and what is ordinarily connoted by this *371 term, and not to extend it to inaccurate or misleading information. See Farrington v Total Petroleum, Inc, 442 Mich 201, 210; 501 NW2d 76 (1993) (“Courts cannot assume that the Legislature inadvertently omitted from one statute the language that it placed in another statute, and then, on the basis of that assumption, apply what is not there.”); Paselli v Utley, 286 Mich 638, 643; 282 NW2d 849 (1938) (“This court cannot write into the statutes [protections] that the legislature has not seen fit to enact.”).
The majority in this Court concludes that because the Legislature has modified the term “information” with the adjective “truthful” in other statutes, but not the instant one, it must have intended the term “information” in the instant statute to include both truthful and false information. That is, the Legislature obviously knew how to limit “information” to only “truthful information,” and it chose not to limit “information” in that manner in the instant statute. Again, I respectfully disagree. The majority cites nine statutes that contain the phrase “truthful information.”[18] However, *372 six of those statutes were amended in the immediate aftermath of this Court’s decision in People v McIntire, 461 Mich 147; 599 NW2d 102 (1999), which held that a witness did not have to answer questions truthfully in order to receive immunity under MCL 767.6. See MCL 29.7(4); MCL 750.157; MCL 750.453; MCL 750.125(5); MCL 780.702(3); MCL 780.702a(6). That is, in the immediate aftermath of Mclntire, the Legislature inserted “truthful” into MCL 767.6 and other related statutes.[19] As this Court has recognized, this kind of legislative history constitutes the “highest quality” of legislative history. In re Certified Question from the United States Court of Appeals for the Sixth Circuit, 468 Mich 109, 115 n 5; 659 NW2d 597 (2003). One of the other statutes that the majority relies on, MCL 750.122, was also enacted in the wake of Mclntire.[20] Thus, seven out of the nine statutes the majority relies on were amended or enacted immediately after Mcln-tire was decided. This is significant because it strongly suggests that before Mclntire was decided, the Legislature understood that the term “information” by itself means “truthful information,” and it was not until after Mclntire was decided that the Legislature felt it was necessary to modify “information” with “truthful” in order to limit the protections of these statutes to only “truthful information.”[21]
*373 The other two statutes that the majority relies on were enacted before Mclntire was decided, but are quite distinguishable. To begin with, MCL 400.111b, a statute within the Social Welfare Act, refers to both “untrue, misleading, or deceptive information” and “truthful information.” Given that the statute initially uses the phrase “untrue information,” it makes sense that when the statute subsequently uses the term “information,” the Legislature would choose to clarify that it was referring to “truthful information” on this occasion, rather than the previously mentioned “untrue information.”
The final statute the majority relies on, MCL 333.17014, a statute within the Public Health Code, sets forth the legislative findings that supported the Legislature’s enactment of MCL 333.17015 and MCL 333.17515. Legislative findings do not constitute substantive law. See Nat’l Pride at Work, Inc v Governor, 481 Mich 56, 79 n 20; 748 NW2d 524 (2008). Although the legislative-findings statute, MCL 333.17014, on one occasion refers to “truthful information,” neither of the substantive statutes, MCL 333.17015; MCL 333.17515, refers to “truthful information,” even though one of the substantive statutes, MCL 333.17015, repeatedly refers to “information,” and, given the context, it is clear that the statute is referring to “truthful information.” Furthermore, although the legislative-findings statute itself repeatedly uses *374 the word “information” in a manner that makes it clear the Legislature is referring to “truthful information,” the Legislature only modified the term “information” with “truthful” on a single occasion in that statute.
The majority thus has identified nine statutes that use the phrase “truthful information,” and from this the majority concludes that “information” unmodified by “truthful” must include both truthful and false information. However, the majority does not take into account that the Legislature has used the word “information” in 4,849 statutes, and only nine of these statutes modify “information” with “truthful.” Does the majority truly believe that in the other 4,840 statutes in which the Legislature used “information” it was referring to both true and false information?[22] I simply cannot believe it possible that in the nearly 5,000 laws enacted by our Legislature in which “information” was required to be provided, considered, acted on, shared, or evaluated, those laws were unconcerned with, or disinterested in, whether such information was true or false.
Although the Legislature added “truthful” before “information” in a handful of statutes following McIntire, the Legislature likely did not believe it needed to add “truthful” before “information” when it enacted the DLEOA in 2006 (seven years after McIntire was decided) because: (a) the DLEOA was viewed as a codification of Garrity and its progeny, and it is clear that false statements are not protected under those decisions; and (b) the Legislature almost certainly perceived the word “information” as only connoting truth *375 ful information and simply did not feel obligated in perpetuity to add “truthful” every time it used the word “information” just as it might not feel obligated in perpetuity to say “dogs but not cats” in place of “dogs” if, for example, this Court had issued an opinion stating that “dogs” means both “dogs and cats.”[23]
The majority’s reliance on McIntire for anything other than explaining why the Legislature amended MCL 767.6 and similar statutes to add the word “truthful” is misplaced. As the majority explains, McIntire involved the interpretation of MCL 767.6, which at the time provided that “[n]o person required to answer such questions shall thereafter be prosecuted for any offense concerning which such answers may have tended to incriminate him.” MCL 767.7, as amended by *376 1951 PA 276. Although the majority claims that the statute at issue in Mclntire and the statute at issue here are “similar,” and perhaps in some ways they are, there is a critical and relevant difference—only the latter pertains to “information.” It is one thing to say that a person can answer questions falsely; it is another thing to say that a person provides “information” when he or she provides false statements. McIntire reached the former holding, but not the latter. That is, nothing within Mclntire can be read to suggest that false statements constitute “information.” The only thing that Mclntire held was that under MCL 767.6, as it was drafted at the time, a witness who answered questions under an order granting immunity was entitled to such immunity, regardless of whether the witness answered the questions truthfully or falsely.
I agree with the majority that McIntire’s actual holding has not been overruled by this Court and presumably never will be because, as already discussed, the statute at issue has since been amended in such a way that the issue addressed in McIntire will not arise again. The majority seems to believe that this means that we are forevermore encumbered with McIntire’s holding that a person’s statements do not have to be truthful in order for that person to be entitled to immunity. Apparently, the majority believes that to be the case even though McIntire has been superseded by statute and the Legislature has employed statutory language that is entirely different from the language that was at issue in McIntire. Importantly, the statute at issue in McIntire did not use the word “information,” and Mclntire thus did not address its meaning, but the majority uses McIntire to support its conclusion that “information” refers to both true and false statements. However, because the *377 statute at issue here, unlike that at issue in McIntire, only protects “information,” McIntire does not require us to hold that false statements are protected by the statute at issue here. And simply because the Legislature directly reacted to McIntire by inserting the word “truthful” before the word “information” in a handful of statutes does not mean that we must forevermore hold that whenever the Legislature does not add the word “truthful” before “information,” it must be referring to both truthful and false statements. Rather, what most obviously can be drawn from the Legislature’s response to McIntire is that McIntire’s equivalent treatment of truthful and false statements was squarely repudiated, an equivalency that is exactly repeated in the majority’s interpretation in the instant case.
The majority asserts that “the existence of McIntire at the time the DLEOA was enacted provides us great insight into the intent of the Legislature” and “we see no reason to abandon McIntire now.” However, given that McIntire did not interpret the term “information” as we are called upon to do now, and given that McIntire has already been emphatically superseded by legislative enactments, see note 19 of this opinion, I am baffled as to what “great insight into the intent of the Legislature” the majority has derived from McIntire that I am supposedly urging it to “abandon.” If this “great insight” is this Court’s obligation to adhere to the plain language of a statute, I am hardly urging the majority to abandon this. Indeed, it is precisely the plain language of the DLEOA that causes me to conclude that the act does not protect false statements. That is, because the DLEOA only protects “information,” and because the plain meaning of the term “information” does not encompass *378 false statements, the DLEOA does not protect false statements.
2. “COMPELLED”
Additionally, MCL 15.391 defines the term “involuntary statement” as “information provided by a law enforcement officer, if compelled . . . .” (Emphasis added.) Not only are lies not “information,” but they are also not “compelled.”[24] That is exactly why the Fifth Amendment prohibition against compelled self-incrimination does not protect perjury. See Wong, 431 US at 178 (“It grants a privilege to remain silent without risking contempt, but it does not endow the person who testifies with a license to commit perjury.”) (citation and quotation marks omitted); Lefkowitz v Turley, 414 US 70, 77; 94 S Ct 316; 38 L Ed 2d 274 (1973) (“The object of the Amendment ‘was to insure that a person should not be compelled ... to give testimony which might tend to show that he himself had committed a crime.’ ”) (citation omitted). Neither the Fifth Amendment nor the DLEOA was ever intended to protect false statements made to cover up criminal activity.
As previously noted, the Fifth Amendment provides that no person “shall be compelled... to be a witness against himself. ...” US Const, Am V. “The design of the [Fifth Amendment] privilege is . . . to protect [a person] against being compelled to furnish evidence to convict him of a criminal charge.” Brown v Walker, 161 US 591, 605-606; 16 S Ct 644; 40 L Ed 819 (1896). In other words, “the Fifth Amendment privilege speaks only of compulsion[.]” People v Wyngaard, 462 Mich 659, *379 672; 614 NW2d 143 (2000). Therefore, the applicability of Fifth Amendment protection often turns on whether a person’s testimony or statements were compelled.[25]
Pertinent to the instant case, the United States Supreme Court has long recognized that the Fifth Amendment does not endow a person with a license to commit perjury. See Glickstein v United States, 222 US 139, 142; 32 S Ct 71; 56 L Ed 128 (1911) (“[T]he immunity afforded by the constitutional guaranty relates to the past and does not endow the person who testifies with a license to commit perjury.”). In Glick-stein, the Court construed a similar immunity statute that did not contain an exception for perjury.[26] In addressing whether the statute immunized false statements, the Court stated:
[T]he statute expressly commands the giving of testimony, and its manifest purpose is to secure truthful testimony, while the limited and exclusive meaning which the contention attributes to the immunity clause would cause the section to be a mere license to commit perjury, and hence not to command the giving of testimony in the true sense of the word.
The argument that because the section does not contain an expression of the reservation of a right to prosecute for *380 perjury in harmony with the reservations in Rev. Stat., § 860, and the act of 1893, therefore it is to be presumed that it was intended that no such right should exist, we think, simply begs the question for decision, since it is impossible in reason to conceive that Congress commanded the giving of testimony, and at the same time. intended that false testimony might be given with impunity in the absence of the most express and specific command to that effect.
Bearing in mind the subject dealt with we think the reservation of the right to prosecute for perjury made in the statutes to which we have referred was but the manifestation of abundant caution, and hence the absence of such reservation in the statute under consideration may not be taken as indicative of an intention on the part of Congress that perjury might be committed at pleasure. [Id. at 143-144.[27]
The Court concluded that the statute, in compelling the giving of testimony, did not confer immunity wider than that guaranteed by the Constitution. Id. at 142-144.
I believe Glickstein is instructive in assessing the majority’s argument that the DLEOA includes false statements because the Legislature did not use the term “truthful information.” Glickstein rejected the defendant’s analogous argument that, because the statute in that case did not include a perjury exemption that had been included in other statutes, such an exemption did not exist. Similarly, the Michigan Legislature’s use of “truthful” in other statutes appears at most to only reflect a “manifestation of abundant *381 caution” rather than suggesting that the DLEOA does not extend to false statements. Id. at 144.
Further, although Glickstein did not clearly explain why the Fifth Amendment does not endow a person with a license to commit perjury, it recognized the critical relationship between compelled statements and the truth. The United States Supreme Court expounded on this relationship in United States v Knox, 396 US 77; 90 S Ct 363; 24 L Ed 2d 275 (1969), holding that the Fifth Amendment does not protect perjury because those false statements are not compelled. In Knox, the defendant was indicted for including false, material information in his tax filings. He sought Fifth Amendment protection, arguing that his tax filings were compelled by statute and that, had he not filed truthful and complete forms as required, he would have incriminated himself. Similarly, filing no forms at all would have also subjected him to prosecution. The Court rejected the defendant’s argument, noting that he had “taken a course other than the one that the statute was designed to compel, a course that the Fifth Amendment gave him no privilege to take.” Id. at 82. The Court stated that “when [defendant] responded to the pressure under which he found himself by communicating false information, this was simply not testimonial compulsion.” Id. Similarly, in Wong, 431 US at 178, the Court confirmed that the Fifth Amendment does not condone perjury, emphasizing that “the predicament of being forced to choose between incriminatory truth and falsehood, as opposed to refusing to answer, does not justify perjury.”[28]
*382 Garrity statements are protected by the Fifth Amendment because, by requiring an individual to choose between self-incrimination and job forfeiture, the resulting statements are compelled. Garrity, 385 US at 497-498. These statements are “infected by the coercion inherent in [the] scheme of questioning and cannot be sustained as voluntary ...” Id. But, Garrity does not provide a license to lie or commit perjury. United States v Veal, 153 F3d 1233, 1243 (CA 11, 1998).[29] The Fifth Amendment does not protect false Garrity statements because those “deliberate, false statements” result from “independent, voluntary choices.” Id. at 1244.[30] The statements therefore provide an avenue for the prosecution of obstruction of justice.
The issue here is whether defendants’ statements were protected by the DLEOA, not the Fifth Amendment. But in the DLEOA, the Legislature used the term “compelled” when providing statutory protection *383 to Garrity statements. As already explained in this opinion, when considering whether the privilege against self-incrimination is implicated, Fifth Amendment jurisprudence focuses extensively on whether the testimony or statements were “compelled.” In this context, “compelled” has acquired a particular meaning, requiring courts to consider whether specific circumstances giving rise to compulsion are present such that Fifth Amendment protection applies.[31] Because of this, “compelled” should be construed and understood in accordance with that meaning. MCL 8.3a; People v Law, 459 Mich 419, 425 n 8; 591 NW2d 20 (1999). Giving the appropriate meaning to this term of art, the DLEOA does not bar the use of the statements because defendants’ decision to lie constituted a voluntary choice that was not “compelled under threat of dismissal from employment or any other employment sanction . . . .” MCL 15.391.
The government here did not “compel” defendants to lie. Rather, it sought only to “compel” defendants to tell the truth. That defendants chose to provide exculpatory falsehoods, rather than inculpatory truths, resulted in their loss of protection under the Fifth Amendment and MCL 15.393. See Wong, 431 US at 178 (“[E]ven the predicament of being forced to choose between incriminatory truth and falsehood, as opposed to refusing to answer, does not justify perjury.”).[32] Our *384 Constitution and laws protect compelled “information”—incriminating truths, not exculpatory falsehoods.[33]
3. CONTEXT
It must finally be noted that “[a] court does not construe the meaning of statutory terms in a vacuum.” Manuel v Gill, 481 Mich 637, 650; 753 NW2d 48 (2008) (quotation marks and citation omitted). “Rather, we interpret the words in their context and with a view to their place in the overall statutory scheme.” Id. (quotation marks and citations omitted). See also Michigan ex rel Gurganus v CVS Caremark Corp, 496 Mich 45, 59; 852 NW2d 103 (2014) (“Individual words and *385 phrases are not read in a vacuum; we examine the statute as a whole, reading individual words and phrases in the context of the entire legislative scheme.”) (quotation marks and citation omitted). The statute at issue here is based upon an obvious theory of quid pro quo: police officers provide information to the government about police misconduct, and in exchange the government agrees not to use the information against the officers. Both the government and the officers thereby receive a benefit—the government receives information that may be helpful in identifying criminal misconduct, and the officers effectively receive immunity.[34] However, where the officers proceed to lie to the government, the government is deprived of that to which it was entitled in exchange for the grant of immunity—information.[35] There is simply no longer any consideration given by the officers, i.e., there is no quid pro quo. In such a situation, the officers should likewise be deprived of that for which they bargained— immunity. Otherwise, they would receive what they bargained for—immunity—without having to fulfill their part of the bargain—providing information—and the manifest truth-seeking function of the statute would thus be nullified. No Legislature, and no legislator, could conceivably have intended such a result. As the Court of Appeals explained:
*386 We conclude that the Legislature’s manifest intent was to create a mechanism for facilitating internal police investigations and to provide an incentive for officers who cooperate by providing needed facts. The Legislature certainly did not intend to immunize police officers by precluding the use of their lies and false statements in criminal proceedings. Indeed, such a strained construction of MCL 15.393 would be wholly contrary to the Legislature’s purpose in enacting the statute. In sum, the plain language of MCL 15.391(a) establishes that an “involuntary statement” includes only truthful and factual information. Quite simply, when an officer lies, he or she provides no “information.” Accordingly, MCL 15.393 does not preclude the use of the officer’s lies in a criminal proceeding. [Hughes, 306 Mich App at 130.]
Reference to “information provided by a law enforcement officer,” MCL 15.391(a), in exchange for immunity, cannot reasonably be interpreted to mean simply any utterance of words; instead, it must reasonably be interpreted as meaning truthful information. Given that the obvious purpose of the statute at issue is to assist in the discovery of police misconduct, an indispensable element of the induced statement is that it be truthful so that it may—in fact or potentially—assist in such discovery. If the police officers who are questioned are allowed to provide false statements without consequence, i.e., without adversely affecting their guarantee of immunity, not only is the government not assisted in its responsibilities to investigate and punish police misconduct, but it may be affirmatively hindered or obstructed in this regard by the false statements, which indeed is exactly what occurred in the case at hand.[36] In *387 this case, after defendants stated that defendant Hughes did not have any improper physical contact with the complainant, the investigation was terminated and it was not revived until a year later and that was only because the person who had been assaulted by defendant Hughes hired a private investigator who later discovered the video recording of the assault. Allowing an officer to provide false statements and yet receive full immunity utterly defeats the obvious purpose of the statute and serves no comprehensible alternative purpose.[37] As a result, I believe that construing *388 the DLEOA in light of its obvious purpose—assisting in the discovery of police misconduct—strongly supports the conclusion that “information” presupposes “truthful information.” Simply put, there is no reason to enact an immunity statute if it cannot produce “information” that is helpful in uncovering police misconduct. As the United States Supreme Court explained, “it is impossible in reason to conceive that Congress commanded the giving of testimony, and at the same time intended that false testimony might be given with impunity in the absence of the most express and specific command to that effect.” Glickstein, 222 US at 143. Similarly, I am not persuaded that the DLEOA protects false statements absent any “express and specific command to that effect,” which the DLEOA does not contain. Id.
III. CONCLUSION
Because I agree with the Court of Appeals that neither the Fifth Amendment nor the DLEOA forbid the use of a law enforcement officer’s false statements in a subsequent prosecution for obstruction of justice, I respectfully dissent and would affirm the judgment of the Court of Appeals.
Viviano, J., concurred with Markman, J.

 Defendants Harris and Little did nothing to aid the victim or to prevent the assault. Defendant Hughes was also charged with misconduct in office and assault and battery arising out of the assault on Hodges-Lamar, but those charges are not the subject of this appeal.

 Defendants also signed a reservation-of-rights form, which was similar to the notiflcation-of-constitutional-rights form. Defendants now argue that the waivers they signed bar the use of their statements. However, defendants never made this argument in the lower courts, and this argument, therefore, was not addressed. Because defendants did not preserve this argument below, I would hold that it has been waived. Walters v Nadell, 481 Mich 377, 387; 751 NW2d 431 (2008) (“[A] failure to timely raise an issue waives review of that issue on appeal.”) (citation and quotation marks omitted).

 The district court was bound by People v Allen, 15 Mich App 387; 166 NW2d 664 (1968), which held that the Fifth Amendment protects false statements. The Court of Appeals subsequently observed in the instant case that “[g]iven the intervening developments in federal law,.. . the reasoning of Allen cannot stand.” People v Hughes, 306 Mich App 116, 127; 855 NW2d 209 (2014). For the reasons discussed later, I agree.

 The parties here do not argue that the Michigan Constitution should be interpreted differently than the United States Constitution. Accordingly, I limit my constitutional analysis to the Fifth Amendment. See People v Wyngaard, 462 Mich 659, 671 n 10; 614 NW2d 143 (2000) (“We confine our analysis to the Fifth Amendment because defendant has not argued that art 1, § 17 provides broader protections.”); see also People v Tanner, 496 Mich 199, 256; 853 NW2d 653 (2014) (“Although this Court need not interpret a provision of our Constitution in the same maimer as a similar or identical federal constitutional provision, we are persuaded in the present instance, on the basis of our examination of Article 1, § 17, that the United States Supreme Court’s interpretation of the Self-Incrimination Clause of the Fifth Amendment in [Moran v Burbine, 475 US 412; 106 S Ct 1135; 89 L Ed 2d 410 (1986)] constitutes the proper interpretation of Article I, § 17 as well.”).

 However, “given adequate immunity, the State may plainly insist that employees either answer questions under oath about the performance of their job or suffer the loss of employment.” Lefkowitz v Turley, 414 US 70, 84; 94 S Ct 316; 38 L Ed 2d 274 (1973). Such statements are now sometimes referred to as “Garrity statements.”

 More specifically, the Court held that “a witness who, while under investigation for possible criminal activity, is called to testify before a grand jury and who is later indicted for perjury committed before the *363 grand jury, is [not] entitled to have the false testimony suppressed on the ground that no effective warning of the Fifth Amendment privilege to remain silent was given.” Wong, 431 US at 174-175, 178.

 The federal use-immunity statute, 18 USC 6002, provides that when a witness is compelled to testify over his or her claim of a Fifth Amendment privilege, “no testimony.. . may be used against the witness in any criminal case, except a prosecution for peijury, giving a false statement, or otherwise failing to comply with the order.”

 Indeed, defense counsel for defendant Little seemed to concede this at oral arguments before this Court. Chief Justice Young asked defense counsel, “The protection afforded by Garrity did not extend to lies made as a Garrity statement, correct?” Defense counsel responded, “Absolutely correct].]”

 In addition, MCL 15.395 provides, in pertinent part:
An involuntary statement made by a law enforcement officer is a confidential communication that is not open to public inspection. The statement may be disclosed by the law enforcement agency only under 1 or more of the following circumstances:
(a) With the written consent of the law enforcement officer who made the statement.
(b) To a prosecuting attorney or the attorney general pursuant to a search warrant, subpoena, or court order, including an investigative subpoena issued under chapter VIIA of the code of criminal procedure, 1927 PA 175, MCL 767a.1 to 767a.9. However, a prosecuting attorney or attorney general who obtains an involuntary statement under this subdivision shall not disclose the contents of the statement except to a law enforcement agency working with the prosecuting attorney or attorney general or as ordered by the court having jurisdiction over the criminal matter or, as constitutionally required, to the defendant in a criminal case.

 Similarly, “inform” means “to give or impart knowledge of a fact or circumstance to” or “to supply (oneself) with knowledge of a matter or subject!.]” Random House Webster’s College Dictionary (1992). Lies do not “impart knowledge.” Indeed, one becomes increasingly less informed *366 as the result of lies. Consider, for example, the concept of “informed consent,” which is defined as “a patient’s consent to a medical or surgical procedure or to participation in a clinical study after being properly advised of the relevant medical facts and the risks involved.” Id. (emphasis added). We would never state that a patient who consented to a medical procedure after being lied to about the relevant medical factors or risks in that medical procedure provided genuinely “informed consent.” Likewise, we should not here conclude that officers who lied about misconduct nevertheless provided “information.”

 Similarly, ‘knowledgeable” means “well-informed.” Random. House Webster’s College Dictionary (1992). We do not think of someone who knows nothing accurate about a subject as being “knowledgeable” or “well informed” regarding that subject. Accordingly, we should not think of someone who provided inaccurate statements as having imparted “knowledge” or “information” in that regard.

 The majority concludes that the definitions of “information” and “knowledge” do not exclude statements that are false. However, all the definitions that the majority relies on do, in my opinion, exclude statements that are deliberately false, such as the ones at issue here. *367 The majority relies on the following definitions of “information”: “knowledge communicated or received concerning a particular fact or circumstance”; “[klnowledge or facts communicated about a particular subject, event, etc.; intelligence, news”; and “the communication or reception of knowledge or intelligence[.]” (Citations and quotation marks omitted). In addition, the majority relies on the following definition of “knowledge”: “the sum of what is known!.]” (Citation and quotation marks omitted). Each of these definitions strongly suggest that “information” and “knowledge” are things that are known, or at least believed, to be true at the time that they are communicated. However, when the officers here provided the statements at issue, they knew that their statements •were false. That is, the officers “knew” that defendant Hughes assaulted Hodges-Lamar, and yet they stated just the opposite. Thus, the officers’ statements were very much at odds with their “information” or “knowledge” on the subject of what had occurred concerning Hodges-Lamar.

 Even putting aside the dictionary definitions this opinion cites, I do not believe that any ordinary or reasonable meaning of the word “information” includes false statements, and the majority identifies none. Would one person of a hundred taken at random from the streets of any community of this state disagree regarding this entirely ordinary meaning? And would it make the slightest difference whether any of them relied on a collegiate dictionary, a children’s dictionary, a supermarket dictionary, an English-as-a-second-language dictionary, the Oxford English Dictionary, or no dictionary at all?

 The majority relies on the Corpus of Contemporary American English (COCA), a truly remarkable and comprehensive source of *368 ordinary English language usage compiled by linguistic scholars at Brigham Young University, in particular Professor Mark Davies. The COCA, available at <http://corpus.bjna.edu/coca/> (accessed June 7, 2016), is an online “resource [that can be used by courts] for assessing the ordinary meaning of a statutory term.” State v Rasabout, 2015 Utah 72, ¶ 72; 356 P3d 1258 (2015) (Lee, A.C.J., concurring in part) (assessing with an impressive thoroughness, in ¶¶ 40-134, the strengths and limitations of using a corpus to facilitate the interpretive processes of the judiciary). By using the COCA, “we can access large bodies of real-world language to see how particular words or phrases are actually used in written or spoken English.” Id. at ¶ 57. However, notwithstanding the majorit/s invocation of the COCA, I believe that the COCA actually supports the proposition set forth in this dissent that the common and most reasonable understanding of the term “information” excludes false statements. The term “information” is found within the COCA 168,187 times, and yet it is only modified by the term “truthful” 28 times, “true” 18 times, “accurate” 508 times, “inaccurate” 112 times, and “false” 271 times. In other words, the term “information” is modified by one of these adjectives 937 times. The other 167,250 times that the word “information” is used it is unmodified by one of these adjectives. That is, 99.44% of the time “information” in the COCA is unmodified by any of these adjectives related to veracity. Therefore, I disagree with the majority’s contention that the COCA affords support for the proposition that the term “information” is “regularly” or “commonly” modified by one of these adjectives. I find to the contrary. And where “information” is unmodified by one of these adjectives, I believe it is overwhelmingly used to refer to truthful information. See, e.g., the utterly ordinary, commonplace, and pedestrian usages of “information” set forth in the COCA (among 167,248 others) at Morgenson, Outside Advice on Boss’s Pay May Not Be So Independent, New York Times (April 10, 2006) (“The company operates Verizon’s employee benefits Web sites, where its workers get information about their pay, health and retirement benefits, college savings plans and the like.”); Anderson, As Lenders, Hedge Funds Draw Insider Scrutiny, New York Times (October 16, 2006) (“When a public company takes out a loan, it generally agrees to provide the lender with certain information, sometimes including monthly financial updates.”). I do not believe that a judicial interpretation of “information” drawn from use of the term in V2 of 1% of all of its appearances in a corpus constitutes an ordinary, common, or reasonable interpretation of the term. There is no word that cannot be abused, misused, or employed in an exotic or puzzling way in everyday discourse, and a corpus will reflect this reality; it is not, however, the purpose of a corpus to transform every such use of a word into a *369 reasonable construction of the words of the law. As Lincoln once remarked, “calling the tail [of a calf] a leg, [does] not make it a leg .. . 2 Burlingame, Abraham Lincoln: A Life (Baltimore: Johns Hopkins University Press, 2008), p 468 (citation and quotation marks omitted). Furthermore, the reader may wish to peruse at random any number of the 167,250 uses of “information” in the COCA and assess whether the term was reasonably used and understood as indistinguishably referring to true and false information. When, for example, the doctor is offered “information” from a patient concerning the latter’s condition, would either party suppose that the latter was not intending in a reasonably accurate manner to describe his symptoms as he then believed them to be? Or, by further example, when a “contract” or “trade-off” of some kind is delineated by the elected representatives of the people in the Legislature, with an explicit quid pro quo defined in terms of the production of “information,” and presumably with some measure of public benefit to be derived by the production of that “information,” could that Legislature genuinely have been disinterested in whether such information was true or false?

 See also Random House Webster’s College Dictionary (1992), which defines “mis” as “a prefix applied to various parts of speech, meaning ‘ill,’ ‘mistaken,’ ‘wrong,’ ‘wrongly,’ ‘incorrectly,’ or simply negating: mistrial; misprint; mistrust.”

 Similarly, “disinformation” means “false information deliberately and often covertly spread (as by the planting of rumors) in order to *370 influence public opinion or obscure the truth,” and the prefix “dis” means “[to] do the opposite of[.]” Merriam Webster’s Collegiate Dictionary (11th ed).

 Judge Wilder also relied on the fact that MCL 15.393 refers to “a criminal proceeding,” rather than the criminal proceeding. See MCL 15.393 (“An involuntary statement made by a law enforcement officer .. . shall not be used against the law enforcement officer in a criminal proceeding.”) (emphasis added). However, it would not make any sense for MCL 15.393 to refer to the criminal proceeding because at the time that a Garrity statement is given, there is no criminal proceeding to definitively identify by use of the definite article “the.” Furthermore, the fact that the statute refers to “a criminal proceeding” rather than “the criminal proceeding” simply does not address the question at issue here—whether an officer’s false statements can be used against the officer “in a criminal proceeding.”

 These statutes will be discussed in greater detail in the main text of this opinion, but for context, I note that six of the statutes the majority relies on are either in the Michigan Penal Code or the Code of Criminal Procedure, and one is in the Fire Prevention Code. These seven statutes provide that compelled, truthful information “shall not be used against the witness in a criminal case, except for impeachment purposes or in a prosecution for perjury,” with the exception of MCL 750.122(2), which is an exception to the bribery statute that allows a witness to be paid "reasonable costs” to “provide truthful information.” The eighth and ninth statutes relied on by the majority are quite different from the preceding seven statutes. The eighth statute, MCL 400.111b, is part of the Social Welfare Act, and it provides, in pertinent part, that a healthcare “provider shall certify that a claim for payment. .. does not contain untrue, misleading, or deceptive information” and that the "provider shall supply complete and truthful information as to his or her professional qualifications and training. . . .” MCL 400.111b(17) and (20). The ninth statute, MCL 333.17014, is part of the Public Health *372 Code and sets forth, legislative findings, rather than substantive law. It explains that the related substantive laws were designed to provide “objective, truthful information” so that women can make informed decisions about abortions.

 McIntire was decided on September 14, 1999, and these statutes were amended on December 28, 1999.

 MCL 750.122 was enacted on January 9,2001, and became effective on March 28, 2001.

 The majority also suggests that because numerous statutes expressly state that compelled information “shall not be used against the witness in a criminal case, except for impeachment purposes or in a *373 prosecution for perjury,” see, e.g., MCL 750.453, and the instant statute does not, we should not incorporate such an exception into the instant statute. However, there are only eight statutes that contain this language, and none of them contained that language until they were amended in 1999 immediately after McIntire was decided. See MCL 29.7(4); MCL 750.125(5); MCL 750.157; MCL 750.453; MCL 767.6(3); MCL 767.19b(2); MCL 780.702(3); MCL 780.702a(6). In addition, see the discussion of Glickstein v United States, 222 US 139; 32 S Ct 71; 56 L Ed 128 (1911), later in this opinion.

 I recognize that in a few of these statutes the word “information” is modified by other adjectives, such as “inaccurate” or “misleading”; as previously discussed, however, I believe that in the great majority of these statutes “information” is used to mean “truthful information.”

 At some juncture after this Court has interpreted words in a highly unusual manner, the Legislature must be allowed again to use words as they are commonly understood by the people whom they represent. That is, it is one thing to say that when, in the ordinary course of statutory interpretation, this Court has interpreted a word, the next time the Legislature uses that same word, it is presumed to mean what we have previously said it means, but it is quite another thing to say that when this Court has interpreted a word in a highly unusual manner, we will presume that whenever that same word is subsequently used by the Legislature, it is presumed to mean what we have previously said it means. After some reasonable duration, we have to assume that when the Legislature uses the word “dogs,” it means “dogs,” and not forevermore “dogs and cats.” And perhaps most importantly, in the final analysis, it is this Court that must adhere to the language of the people and their representatives and not the people and their representatives that must adhere to the language of this Court. It was this Court’s decision in McIntire in 1999 that has now led to the extraordinarily odd circumstance 17 years later—that in order to effectively communicate its intentions, the Legislature apparently must, whenever it seeks to legislate concerning “information,” systematically insert in the law a disclaimer: “provided, however, that the information requested or provided in this statute be truthful.” This Court may understand the point of such language, but others who are governed by this law will only be confused and befuddled.

 Defense counsel for defendant Harris admitted this at oral arguments when he stated, “Nobody’s compelled to lie .. . .”

 See, e.g., Minnesota v Murphy, 465 US 420, 440; 104 S Ct 1136; 79 L Ed 2d 409 (1984) (holding that because the defendant’s disclosures were not .compelled incriminations, he could not invoke the Fifth Amendment privilege); Miranda v Arizona, 384 US 436, 467; 86 S Ct 1602; 16 L Ed 2d 694 (1966) (“[W]ithout proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual’s will to resist and to compel him to speak where he would not otherwise do so freely.”).

 The statute provided, in pertinent part, “ ‘no testimony given by him shall be offered in evidence against him in any criminal proceeding.’ ” Glickstein, 222 US at 140-141 (citation omitted). See also note 21 of this opinion.

 This passage suggests that, absent manifest legislative intent to the contrary, statutes compelling the giving of testimony are presumed to require that the testimony be truthful. If such a presumption had been in play in Mclntire, perhaps this Court would have reached a different result.

 Other courts have reached the same conclusion.. See, e.g., United States v Thomas, 612 F3d 1107, 1128 (CA9, 2010) (“But [defendant] was not in any way compelled to ‘knowingly giv[e] Grand Jury testimony that was intentionally evasive, false, and misleading’ by virtue of her grand jury subpoena.”) (second alteration in original); United States v *382 Phillips, 540 F2d 319, 332 (CA 8, 1976) (“[Defendant’s] decision to proffer false answers was in no way compelled; it was a voluntary decision on his part.”); Commonwealth v Good, 461 Pa 546, 553; 337 A2d 288 (1975) (holding witnesses who lied to a grand jury were not compelled to be witnesses against themselves); United States v Tramunti, 500 F2d 1334, 1342 (CA2, 1974) (“If he gives false testimony, it is not compelled at all. . . . [False testimony] is not the incriminatory truth which the Constitution was intended to protect.”).

 Veal was overruled on other grounds by Fowler v United States, 563 US 668 (2011).

 The fact that Garrity statements are not made under oath is immaterial to the Fifth Amendment analysis. Veal, 153 F3d at 1241 (“Like false testimony before a grand jury, the Court has not excluded from criminal liability false statements made to government agents or agencies, whether or not those statements were made under oath.”). See also LaChance v Erickson, 522 US 262, 267; 118 S Ct 753; 139 L Ed 2d 695 (1998) (holding that it was irrelevant that statements were not made under oath for the purpose of criminal culpability for making false statements to government agency investigators).

 Cf. Howes v Fields, 565 US _, _; 132 S Ct 1181, 1189; 182 L Ed 2d 17 (2012) (“As -used in our Miranda case law, ‘custody’ is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion.”).

 Nothing in the way of rational public policy would result from protecting exculpatory falsehoods. By such a conclusion, the government would be unable to obtain information that it needs to uncover police misconduct, and officers who possess such information would be permitted to lie about it without concern for criminal repercussions.

 For what it is worth, interpreting MCL 15.393 as providing the same protections as Garrity and its progeny, i.e., as not protecting false statements, is also consistent with House Legislative Analysis, SB 647, December 7, 2006, which states:
The U.S. Supreme Court has already established that involuntary statements made by law enforcement officers during internal investigations cannot be used against the officers in a criminal prosecution. Concerning this matter, the bill would simply codify the federal court ruling. [Emphasis added.]
It is likewise consistent with Senate Legislative Analysis, SB 647, February 20, 2007, which states:
By providing that an involuntary statement made by a law enforcement officer, and any information derived from it, may not be used against the officer in a criminal proceeding, the bill effectively codifies Garrity protections in Michigan statutory law. [Emphasis added.]
Contrary to the majority’s suggestion, by the time that the DLEOA was enacted in 2006, the “Garrity protections” were well understood as excluding protection of false statements. While I recognize the limitations inherent in reliance on legislative analyses as an aid in the construction of a statute, see In re Certified Question, 468 Mich at 115 n 5, it is nonetheless notable when the construction of a statute, reached without reliance on a legislative analysis, conforms fully with such a legislative analysis.

 More specifically, the officers’ statements cannot be nsed against them in a criminal proceeding. However, the practical effect of that is almost always going to be the same as immunity, as it was in this case.

 Cf. Apfelbaum, 445 US at 132 (Brennan, J., concurring in the judgment) (recognizing that the perjury exception to the Fifth Amendment is based in part on “the simple reality that affording the witness a right to lie with impunity would render the entire immunity transaction futile.”); id. at 135 (Blackmun, J., concurring in the judgment) (“Perjury or the making of false statements under a grant of immunity thus violates a basic assumption upon which the privilege and hence the immunity depend.”).

 As one commentator explained:
The state has a strong preference against allowing persons to lie with impunity, for lying prejudices the state in ways that neither silence nor truth-telling does. Silence with impunity may disable the state from acquiring information from a witness, but it has the virtue of leaving the state no worse off than if the witness had never existed. Truth-telling with impunity may *387 disable the state from using a witness’s statements against him criminally, but it enlightens the state and enables the state to use the information for all other purposes. In contrast, lying with impunity leaves the state worse off than it was before. Lying with impunity not only disables the state from using the lies as criminal evidence against the person, but it affirmatively misleads and confuses the state regarding the truth. Not surprisingly, the Court finds no place for lying:
In [the] constitutional process of securing a witnesses] testimony, perjury simply has no place whatever. Perjured testimony is an obvious and flagrant affront to the basic concepts of judicial proceedings .... Congress has made the giving of false answers a criminal act punishable by severe penalties; [for] in no other way can criminal conduct be flushed into the open where the law can deal with it. [Westen, Answer Self-Incriminating Questions or Be Fired, 37 Am J Crina L 97, 123-124 (2010), quoting United States v Mandujano, 425 US 564, 576; 96 S Ct 1768; 48 L Ed 2d 212 (1976) (alterations in original).]

 The majority asserts that “the protections offered by the DLEOA are intended to encourage and facilitate officers’ participation in internal investigations, with the goal of rendering those investigations more fruitful and effective.” I fail to see how lies render investigations more fruitful and effective. Indeed, I believe that they have the very opposite effect—they hinder and thwart investigations. I do not believe that any reasonable Legislature could conceivably have wished to encourage police officers to lie during an internal investigation or even been disinterested in whether such lies took place. The majority posits that “[n]ot all statements, after all, are clearly true or entirely false, and the Legislature may have concluded that qualifying the DLEOA’s statutory protections *388 based on veracity would unduly complicate the implementation of those protections or undermine the certainty and effectiveness of the protections offered.” It is one thing to conclude that the Legislature intended to protect statements that were made by a person who at the time believed the statements to be true, even if it is subsequently determined that the statements were incorrect, but it is quite another thing to suppose that the Legislature intended to protect statements that were made by a person who at the time knew that his or her statements were false, which is what happened in the instant case. Given that the Legislature only extended protection to “compelled information,” I simply cannot believe it intended to protect deliberate falsehoods. Deliberate falsehoods clearly do not constitute “compelled information.”